## MAGWIRE vs. TYLER ET AL.

1. Surveys under confirmations of Spanish titles in the Upper Louisiana country are, in regard to their correctness, within the jurisdiction of the Commissioner of the General Land Office, and that officer has power to adjudge the question of accuracy preliminary to the issuing of a patent.

2. The Secretary of the Interior has the power of supervision and appeal in all matters relating to the General Land Office, and that power is co-extensive with the authority of the Commissioner to adjudge.

3. The Secretary, in the exercise of his supervisory powers, may lawfully set aside a survey made under a confirmed Spanish grant, order another to be made, and issue a patent upon it.

4. Where the construction of the acts of Congress, defining the powers of the Secretary of the Interior, is drawn in question in a State court, and the decision is against the title set up by maintaining the validity of the Secretary's decision, this court has jurisdiction to revise the case on writ of error.

This case came up on writ of error to the Supreme Court of the State of Missouri. It was commenced in the St. Louis Land Court, (equity side,) by petition and summons, agreeably to the code of Missouri. The plaintiff, John Magwire, claimed four arpents by four of land lying in the county of St. Louis, of which the defendants, Mary L. Tyler and others, were wrongfully in possession. The petition prayed a decree for title in them—for possession--for an account of profits, and an injunction against waste. The defendants answered at length,

denying the material facts set forth in the petition, and assert-ing that they were rightfully in possession. The Land Court heard the cause, found the facts specially, and made a decree in favor of the defendants, dismissing the petition, which was affirmed afterwards by the Supreme Court of the State, and the plaintiff took this writ of error. What the facts in dispute were, and how they were found by the court of original juris-diction, will appear by reference to the opinion of Mr. Justice *Catron.* The defendants in error moved to dismiss the writ for want of jurisdiction, and the court heard the argument on that motion, and upon the errors assigned by the plaintiff in the judgment of the State court at the same time.

*Mr. Ewing,* of Ohio, for plaintiff in error. The two con-firmations were connected in the same concession and included in one survey. That survey was recognised by the United States and acquiesced in by the parties for more than fifteen years. It vested an inchoate legal title in both according to their re-spective interests. It never was appealed from. Though the patent was irregular, yet, having issued, the legal title attends it. *Kissell* vs. *St. Louis,* (18 How., 22;) *Elliott* vs. *Pierson,* (1 Pet., 341.) But it did not affect the *equitable* rights of parties under the confirmation and survey. No appeal lay to the Secretary of the Interior. The Surveyor General is alone re-sponsible for it, and he acts under no directions but those of the law and the judgment of the commissioners who confirmed the title. The survey of 1851, under which the patent issued, was a gross violation of right; it was made under the order of the Secretary, who had no authority against the expressed opinion of all the officers who had authority. This court has decided, and it is not denied, that the plaintiff cannot sustain ejectment against the patent. *West* vs. *Cochran,* (17 How., 416.) *Wilcox* vs. *Jackson,* (13 Pet., 517.) But the equity of the plaintiff (and that is what he now claims) was complete by the confirmation and survey.

This court has jurisdiction to review the State court in a case like the present.

Brazeau claims an equitable *title* to a specific tract of land,

described in his bill.   He claims it under a statute of the United States, and the acts of public officers under that statute; and the decision of the State court was *against his title.* This gives jurisdiction; and it is quite immaterial whether it was decided *"upon a question of fact or law."*   *Lytle* vs. *The State of Arkansas,* (22 How., 202, 203;) *Chouteau* vs. *Eckhart,* (2 How., 372;) *Mobile* vs. *Eslava,* (16 Pet., 234;) *Martin* vs. *Hunter's Lessee,* (1 Wh., 357–8–9;) *Smith* vs. *The State of Maryland,* (6 Cr., 280.)

*Mr. Hill,* of Missouri, and *Mr. Stanton,* of Washington city, for defendants, claimed that the legal merits of the case were against the plaintiff on many grounds.

1. The confirmation to Brazeau was void, not being within the act of Congress.

2. If not void, Brazeau's representatives are concluded by the patent.

3d. The patent of 1852 was conclusive and regular, being founded on what was in fact a resurvey of Soulard's survey.

4. Brazeau's grant was unauthorized because it came from the Lieutenant Governor, who had no power to make it; it was not definitely located; there was no survey nor plat of it on record.

5. A court of equity, after this lapse of time, cannot change the rights recognised heretofore, and especially where it will disturb the possession of innocent purchasers after the lands have greatly risen in value.

6. The plaintiff, who claims under Pierre Chouteau, is estopped by the boundary line established between Labeaume and Chouteau in 1799.

7. This case is settled by the decision in *West* vs. *Cochran,* (17 How., 416.)   The plaintiff has no right to go into equity and there claim that his land shall be located where the legal title cannot be located.

But this court has no jurisdiction.   It must appear from the record, either expressly or by necessary intendment, that some question which this court has a right to re-examine has been decided by the State court, otherwise the writ must be dismissed.   *Medbury* vs. *Ohio,* (24 How., 414;) *Crowell* vs. *Ran-*

*dall*, (10 Peters, 368;) *McKenney* vs. *Carroll*, (12 Peters, 66;) *Ocean Insurance Company* vs. *Polly*, (13 Peters, 157;) *Coon's Lessee* vs. *Gallaher*, (15 Peters, 19;) *Armstrong* vs. *Treasurer, &c.*, (16 Peters, 281;) *Fulton* vs. *McAfee*, (16 Peters, 149;) *Commercial Bank* vs. *Buckingham's Executors*, (5 Howard, 317;) *Smith* vs. *Hunter*, (7 Howard, 738;) *Lawler* vs. *Walker*, (14 Howard, 149;) *Robertson* vs. *Coulter*, (16 Howard, 107.)

Mr. Justice CATRON. In 1794, Joseph Brazeau had granted to him, by the Lieutenant Governor of Upper Louisiana, a tract of land, four arpents in front by twenty arpents deep, which extended in a N. N. west course, from the foot of the hill where stands the Grange de Terre, ascending to the vicinity of Stony creek, bounded on one side by the bank of the Mississippi; on the opposite side by the public domain; and on the southern side the tract was bounded by the concession to the free mulattress Esther, made in 1793.

In 1798, Brazeau sold and conveyed to Labeaume part of his concession. The deed includes four arpents, "to be taken from the foot of the hill or mound commonly called the Grange de Terre, by twenty arpents in depth, bounded by the Rocky branch on the extremity opposite the said mound; reserving to myself (says Brazeau's deed) four arpents of land, to be taken at the foot of said mound, in the southern part of the aforesaid tract; selling only sixteen arpents in depth to the said Labeaume."

In 1799, Labeaume applied to the Governor, and got his tract of 4 by 16 arpents enlarged, including the land conveyed to him by Brazeau, extending north to the Rocky Branch, calling for twenty arpents in depth. This enlarged tract the Governor ordered Soulard to survey for Labeaume, and to put him into possession; which the surveyor did, in April, 1799.

Labeaume applied to have his claim confirmed by the board of commissioners, and, in 1810, it was confirmed for 356 arpents; and at the same time, acting on Brazeau's concession of 1794, the board confirmed to him his 4 by 4 arpents, adjoining Labeaume's tract on the south.

The board ordered that Labeaume's concession should be

surveyed, in conformity to the order of survey made by the Lieutenant Governor; and that Brazeau's tract of sixteen arpents "should be surveyed, agreeably to a reserve made in a sale from Joseph Brazeau to Louis Labeaume." This survey was to be made conformably to the reservation in the deed, and that reservation was at the foot of the mound.

Patents were ordered to be issued to the parties respectively; but, owing to litigation before the department of public lands and in the courts of justice, between the parties claiming the reservation, and the proper mode of surveying the tract, was not settled till 1852, when the surveys were approved, and patents issued to each of the parties, locating the southern boundary of Brazeau's claim at the foot of the mound, and the opposite line, adjoining the southern boundary of Labeaume, four arpents further north, at an old ditch. Brazeau's representatives refused to accept the patent for the sixteen arpents, and caused it to be recalled at the General Land Office. His claim, therefore, stands before the court as it existed in 1810, when the board of commissioners confirmed it as valid.

The assignees of Brazeau brought an action of ejectment, to recover possession of 4 by 4 arpents above Labeaume's southern line, and within his survey; but this court held, that the power to survey and fix definite boundaries, and issue a patent for Brazeau's tract, was a sovereign power, reserved to the executive branch of the Government, and that a court of justice had no jurisdiction to locate the claim. *West* vs. *Cochran*, (17 How.)

The unsuccessful party then filed his bill in a State Circuit Court, and insists that equity can do what was declared could not be done at law, on the assumption that the court only decided in the former case that Brazeau's incipient but equitable title would not sustain an action of ejectment.

In the year 1817, "by authority of the United States and under the direction of the Surveyor General for the district of Illinois and Missouri," the tract of land confirmed to Brazeau was surveyed by Joseph C. Brown, a deputy surveyor, conjointly with Labeaume's enlarged tract. The surveyor certifies that he had "surveyed for Louis Labeaume two tracts in

one: the one confirmed in his own name for 356 arpents; the other, under Joseph Brazeau, for four arpents;" together, 360 arpents—equal to $306\frac{1}{4}$ acres.

The courses and distances of the lines are given. At one of the corners the call is for a stone at the mouth of an old ditch, the lower corner of the survey on the river. The next line runs westwardly with the ditch. This survey was returned to the Surveyor General's office, and duly approved shortly after it was made. It purported to include Brazeau's tract of sixteen arpents, and, of course, it was located in the southeast corner of the survey.

When this survey was presented to the recorder of land titles to obtain a patent certificate, he refused to issue one, because both tracts were included in one survey; whereas, the recorder held that the confirmation certificates required separate surveys. Thus the matter stood till 1833, when Brown made another survey of Labeaume's tract, maintaining the ditch as the southern boundary, and throwing off on the west a surplus to reduce the tract to the quantity confirmed to Labeaume.

The representatives of Brazeau claimed to own the tract of four by four arpents north of the ditch, as indicated in Brown's survey of 1817, and a contest was carried on before the department of public lands as to the proper location of Brazeau's claim, according to his confirmation, for nearly twenty years. Finally, the Secretary of the Interior ordered that the tracts should be surveyed separately—set the surveys of Brown of 1817 and 1833 aside—and ordered that Brazeau's claim should be surveyed south of the ditch and next to the mound, and that Labeaume's tract should be located north of the ditch.

The representatives of Labeaume hold the land in the southeasterly corner of Brown's survey, and this is the land the bill prays may be decreed to the complainant—first, on the assumption that the confirmation certificate locates it there; and, secondly, that there was no authority in the Secretary of the Interior Department to set the survey of 1817 aside.

Labeaume's survey of 1833 was merely a reformation of the survey of 1817, excluding Brazeau's four by four arpents.

In 1847 the matter as regarded these surveys was reported by the Surveyor General to the General Land Office, where it was held that Brazeau was entitled to his four arpents square in the southeasterly part of Soulard's Spanish survey of 1799, which embraced both Labeaume's and Brazeau's tracts. This decision was overruled by Secretary Stouart in 1851, under whose order a survey was made for Brazeau outside of Labeaume's survey, as made by Brown.

This decision we are called on, in effect, to overthrow, by holding that Brazeau's land is covered by the patent to Labeaume, and the legal title vested in his representatives. And it is insisted that if it is, then a court of equity may decree that it shall be conveyed by the legal owner to him having the better equity. And this raises the question whether the Secretary was authorized by law to reject the survey of 1817, order another, and overthrow Brazeau's claim of title. That the General Land Office has, from its first establishment in 1812, exercised control over surveys generally, is not open to discussion at this day.

By the act of March 3, 1807, the board of commissioners was required to deliver to each party whose claim was confirmed a certificate that he was entitled to a patent for the tract of land designated. This certificate was to be presented to the Surveyor General, who proceeded to have the survey made and returned, with the certificate, to the recorder of land titles, whose duty it was to issue a patent certificate; which, being transmitted to the Secretary of the Treasury, entitled the party to a patent. Act of 1807, S. 6.

This duty of the Secretary of the Treasury, by the act of 1812, is transferred to the Commissioner of the General Land Office.

The act of April 18, 1814, S. 1, requires that accurate surveys shall be made, according to the description in the certificate of confirmation, and proper returns shall be made to the Commissioner of the certificate and survey, and all such other evidence as may be required by the Commissioner.

These acts show that the surveys and proceedings must be,

in regard to their correctness, within the jurisdiction of the Commissioner; and such has been the practice. Of necessity, he must have power to adjudge the question of accuracy preliminary to the issue of a patent.

By the act of July 4, 1836, reorganizing the General Land Office, plenary powers are conferred on the Commissioner to supervise all surveys of public lands, "and also such as relate to private claims of land and the issuing of patents."

By the act of March 3, 1849, the Interior Department was established. The 3d section of the act vests the Secretary, in matters relating to the General Land Office, including the powers of supervision and appeal, with the same powers that were formerly discharged by the Secretary of the Treasury.

The jurisdiction to revise on the appeal was necessarily coextensive with the powers to adjudge by the Commissioner. We are, therefore, of the opinion that the Secretary had authority to set aside Brown's survey of Labeaume's tract, order another to be made, and to issue a patent to Labeaume, throwing off Brazeau's claim.

A preliminary motion was made to dismiss this cause for want of jurisdiction, which was brought on with the final hearing.

The survey made by Brown in 1817 for Labeaume included both the tracts confirmed to Labeaume and Brazeau. This survey was duly approved, and so continued for fifteen years. A patent might have been issued on it, either singly to Labeaume or jointly to the two owners, Brazeau's sixteen arpents being granted to him in the southeast corner of the survey.

Standing on the original concession, Brazeau's tract had no specific boundary, and attached to no land; but Brown's survey identified its locality and boundary, and vested a title to land, subject to be sued for and recovered by the local laws of Missouri, and the bill was filed to assert this title, on the ground that the Secretary of the Interior Department had no authority to set the survey aside, divest Brazeau's title, and locate the land elsewhere. The construction of the acts of Congress, conferring power on the Secretary to do the acts

complained of, were prominently drawn in question, and the decision below rejected the title set up by maintaining the validity of the Secretary's decision.

The case falls within the principle declared in Lytle's case, 22 How., 202. The finding of the State court, and the decree founded on that finding, show that the question necessary to give this court jurisdiction was raised and decided. *Craig* vs. *Missouri*, (4 Peters, 425–6.)

Mr. Chief Justice TANEY. I think the court has not jurisdiction in this case. The only point in dispute appears to be upon the true location of the land reserved by Brazeau in his deed to Labeaume. And that question depends altogether upon the description of it in the deed, and not upon the survey made by the Surveyor General of the United States, nor upon the judgment or decision of the Land Office. It is a judicial question, belonging exclusively to a court and jury of the State, and not embraced in any one of the provisions of the 25th section of the judiciary act of 1789, in which appellate power over a judgment of a State court is conferred upon this court. But as a majority of the court are of a contrary opinion, and have taken jurisdiction, I concur in affirming the judgment.

Mr. Justice GRIER. I concur with the Chief Justice.

*Decree of the Supreme Court of Missouri affirmed.*