# KNIGHT *v.* UNITED STATES LAND ASSOCIATION.

ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

No. 824. Argued October 23, 26, 1891. — Decided December 21, 1891.

This court takes judicial notice of facts concerning the pueblo of San Francisco, (not contradictory of the findings of the referee in this case,) which are recited in former decisions of this court, in statutes of the United States and of the State of California, and in the records of the Department of the Interior.

It is settled law that a patent for public land is void at law if the grantor State had no title to the premises embraced in it, or if the officer who issued it had no authority to do so; and that the want of such title or authority can be shown in an action at law.

The power to make and correct surveys of the public lands belongs exclu-

sively to the political department of the government, and the action of that department is unassailable in the courts, except by a direct proceeding.

In matters relating to the sale and disposition of the public domain, the surveying of private land claims and the issuing of patents thereon, and the administration of the trusts devolving on the government, by reason of the laws of Congress, or under treaty stipulations respecting the public domain, the Secretary of the Interior is the supervising agent of the government, to do justice to all claimants, and preserve the rights of the people of the United States.

The Secretary of the Interior had ample power to set aside the Stratton survey of the San Francisco pueblo lands, (although approved by the surveyor general of California, and confirmed by the Commissioner of the General Land Office, with no appeal taken,) and to order a new survey; and his action in that respect is unassailable in a collateral proceeding.

The method of running the shore line of the bay of San Francisco in the Von Leicht survey was correct.

The well-settled doctrine that, on the acquisition of the territory from Mexico, the United States acquired the title to lands under tide water in trust for the future States that might be erected out of the territory, does not apply to lands that had been previously granted to other parties by the former government, or had been subjected to trusts that would require their disposition in some other way.

The patent of the United States is evidence of the title of the city of San Francisco under Mexican laws to the pueblo lands, and is conclusive, not only as against the United States and all parties claiming under it by titles subsequently acquired, but also as against all parties except those who have a full and complete title acquired from Mexico, anterior in date to that confirmed by the decree of confirmation.

THE court stated the case as follows:

This was an action of ejectment brought in the superior court in and for the city and county of San Francisco, California, by the United Land Association, a corporation of that State, and one Clinton C. Tripp, against Thomas Knight, to recover a block of land in that city bounded by Barry, Channel, Seventh and Eighth Streets, and known as block number forty. The controversy involves an interesting question of title to the property described, the plaintiffs asserting that the premises were below the line of ordinary high-water mark at the date of the conquest of California from Mexico, and, therefore, upon the admission of the State into the Union in 1850, enured to it in virtue of its sovereignty over tide lands; and

the defendant insisting that the lands are a portion of the pueblo of San Francisco, as confirmed and patented by the United States.

The complaint, filed on the 23d of November, 1880, alleged that the plaintiffs were the owners in fee of the premises described, and were entitled to the possession thereof, and that they had been wrongfully dispossessed thereof by the defendant, who continued to hold such unlawful possession, to their damage in the sum of $100, and to their loss of the rents and profits thereof in the sum of $500. Wherefore they prayed a judgment of restitution and damages aforesaid.

The answer consisted of a general denial of all the allegations of the complaint; and the cause, being at issue, was, by stipulation of counsel, referred to a referee, to take testimony, "try all the issues and report his findings and judgment thereon."

In obedience to the order of the court the referee tried the case, making an elaborate finding of facts and concluding, as matter of law, that judgment should go for the plaintiffs. Accordingly, on the 2d of June, 1888, a judgment was entered in the superior court in favor of the plaintiffs. That judgment was afterwards affirmed by the Supreme Court of the State on appeal; and, after two separate rehearings, the judgment of affirmance was adhered to by a bare majority of the court, three of the judges dissenting. 85 California, 448, 474. This writ of error was then sued out.

It appears from the bill of exceptions that, on the trial of the case before the referee, the plaintiffs, to sustain the issues on their behalf, introduced evidence tending to show the location of the premises to be as alleged in the complaint, and also a complete and good title in themselves under a grant from the State and certain mesne conveyances, provided the title to the premises was originally in the State, and provided certain deeds (which were also introduced) from the state tideland commissioners, dated, respectively, November 24 and 27, 1875, were effectual to convey said title. For the purpose of proving title in the State they offered parol testimony to show that in 1854 the premises were below the line of ordinary

high-water mark, and that Mission Creek (which is an estuary of the bay of San Francisco and runs alongside this block) was, at that time, navigable for a considerable distance above them. This evidence was objected to, on the ground that parol evidence was inadmissible to prove the boundary lines of the decree of confirmation of the pueblo lands, but the objection was overruled and an exception noted.

The plaintiffs then offered in evidence certain documents relative to the confirmation to the city of San Francisco of its pueblo lands, and also the first survey of those lands under the decree of confirmation, which survey, made by deputy surveyor Stratton, approved by the surveyor general of California and confirmed by the Commissioner of the General Land Office, did not include the premises in controversy. They also produced a witness who testified that the premises were below ordinary high-water mark, as laid down on such survey. To the introduction of this survey as evidence, and to the parol proof of the location of the premises with reference to the line of high tide, as delineated thereon, the defendant objected on the ground that the survey was not matter of record, that it did not tend to prove, as between the parties hereto, where the line of high tide was, being *res inter alios acta*, and that it had been cancelled and superseded by another survey subsequently made in accordance with instructions of the Secretary of the Interior. The objection was overruled, the survey was admitted in evidence, and the defendant duly excepted.

The plaintiffs also produced in evidence certain maps made by persons in official station in 1853, 1857, 1859 and 1864, showing the line of high tide at about the same line as on the aforesaid Stratton survey. Objections were made to these maps as evidence, but they were overruled and exceptions were noted.

The plaintiffs also introduced in evidence the original minute-book of the board of supervisors of the city and county of San Francisco, and read a resolution passed by the board on the 23d of December, 1878, that no appeal should be taken from the action of the Commissioner of the General Land Office

approving the Stratton survey. Objection was made to this evidence, but it was overruled and an exception was noted.

The plaintiffs then offered in evidence the deeds from the state land commissioners to one Ellis, (from whom they derived their title,) together with the letter of the attorney general of the State, advising the board to dispose of all the tide lands not in litigation, and where they could ascertain to whom the state title ought to go, in pursuance of the tide-land acts. The deeds embrace the property in dispute. The defendant objected to these deeds on the ground that they were incompetent, in that the board of tide-land commissioners had no power or jurisdiction to make them, and on the further ground that there was nothing to show that the board was advised by the attorney general to make such deeds. The objection was overruled, and an exception was noted. The plaintiffs thereupon rested their case.

The defendant, to sustain the issues on his part, offered in evidence the patent of the San Francisco pueblo lands, regularly issued to that city on the 20th of June, 1884, and also the plat of said pueblo lands surveyed under instructions from the United States surveyor general by deputy surveyor Von Leicht in December, 1883, which showed an endorsement of approval by the Commissioner of the General Land Office, under date of May 15, 1884, and was also endorsed as follows: " The field-notes of the survey of the pueblo lands of San Francisco, from which this plat has been made, are strictly in accordance with the instructions of the honorable Commissioner of the General Land Office received with his letter, dated November 25, 1883, as the same appear of record and on file in this office. United States surveyor general's office, San Francisco, California, January 17th, 1884. W. H. Brown, United States surveyor general for California."

It was admitted that the land in question is included within the exterior boundaries of the patent; but the patent was objected to as incompetent to show title in the city of San Francisco, as against grantees of the State of the premises, for the following reasons:

" 1st. The State of California acquired her title by virtue of

her sovereignty on her admission into the Union, and her title could not be overthrown by declarations of the United States made after title had vested in her.

" 2d. That as to lands acquired by virtue of her sovereignty, the State was not the owner of a private land claim, and was not bound to present her claims to the board of land commissioners, organized under the act of Congress entitled, ' An act to ascertain and settle the private land claims in the State of California,' passed March 3, 1851, nor is she concluded as to her rights by not presenting them as provided in section 13 thereof, nor by any decision on the claim of another person. The act did not apply to her or her property.

" 3d. The only authority for the patent was a decree of the United States Circuit Court, which court was not vested with jurisdiction over the State or the property of the State, although it was vested with jurisdiction over natural persons and corporations. Neither the decree nor any proceedings under the decree could affect the title of the State or furnish evidence against her.

" 4th. The State was not a party to the record in the case of The City, &c. v. The United States, nor is she affected as a natural person or corporation would be by a failure to attend before the United States surveyor general and object to a survey, as provided in section one of the act of Congress approved July 1, 1864, and entitled ' An act to expedite the settlement of titles to lands in the State of California.' But, being a stranger to the entire record and proceeding, the patent is not competent evidence against her or her property.

" 5th. The first survey is the final adjudication of the land office of the location of the premises described in the decree, because —

" (a.) In confirming a survey under the acts of March 3, 1851, and July 1, 1864, the Commissioner acts in a special judicial capacity, and his decisions are not appealable to the Secretary of the Interior.

" (b.) The city refused to appeal, and this refusal appears in the record, and there was no appeal.

" (c.) The first confirmed survey is better evidence of the

location in this case than the patent, and the patent is void to the extent that it departs from it.

"(*d.*) The decree confirms to the city only the land above or within the ordinary high-water mark at the date of the conquest.

"The premises are outside that specific boundary, and, as the surveyor general had no authority under the acts of Congress to survey, nor the land office to patent, land not confirmed to the claimant, the decree controls, and the patent is void to the extent that it departs from the specific boundary given in the decree."

The evidence was admitted, but the referee refused to find thereon in favor of the defendant, and an exception was noted.

The defendant also introduced in evidence the judgment roll in a case tried in a state court between this defendant and the city and county of San Francisco, in which a judgment was rendered in his favor in November, 1868, quieting his title to the premises.

That was all the evidence introduced, and upon it the referee found the material facts of the case substantially as follows: The premises in dispute are below ordinary high-water mark as the same existed on the 7th of July, 1846, (the date of the conquest of Mexico,) and are below and outside of a survey of the pueblo claim made by deputy surveyor Stratton, and approved by the surveyor general of California on the 13th of August, 1868, and confirmed by the Commissioner of the General Land Office, November 11, 1878, but are within a subsequent survey of the pueblo, made by deputy surveyor Von Leicht in 1884, which was not approved by the surveyor general of California, but was certified by him to have been made in accordance with orders from the Secretary of the Interior. The patent for the pueblo lands was issued on this second survey, and recited, among other things, the proceedings had in relation to the perfecting of the pueblo title, including the decree of confirmation and the confirmatory acts of Congress. The plaintiffs derived their title from the State through certain mesne conveyances, regular and legal in all

respects, while the defendant did not·connect himself with the title of the State.

Upon the foregoing facts the referee found as conclusions of law that —

(1) The State of California upon her admission into the Union, ·September 9, 1850, became seized in fee of the premises in dispute;

(2) This title subsequently became vested in the plaintiffs, by virtue of certain conveyances described;

(3) This title of the plaintiffs was subject to defeat by the decree of the Circuit Court confirming the claim of the pueblo, but the premises being without the confirmed survey of 1878, and outside of the specific boundary given in the decree, remained the property of the State;

(4) "The second (Von Leicht) survey was illegal because it was not approved by the surveyor general of California,·no appeal was taken to the Secretary of the Interior from the decision·of the Commissioner of the General Land Office approving the prior survey; and because the second survey was not retained in the office of the United States surveyor general for ninety days, and no notice of the same was given to enable parties in interest to file protests, as required by law; and because, in approving said prior survey, said Commissioner of the General Land Office was acting in a judicial capacity and his judgment thereon is not reversible and was not legally reversed"; and,

(5) The description of the premises contained in the patent being in excess of the premises described in the prior survey and in the decree, the patent, to the extent that it covered land of the State not confirmed to the claimant, was invalid, and did not operate to convey the State's title to the premises in controversy.

The judgment of the Supreme Court of the State was based upon substantially the same grounds as that of the referee; and the correctness of the propositions of law involved therein is drawn in question by this writ of error.

To understand precisely the exact nature of the questions involved in this case a somewhat more detailed statement of

facts than is contained in the above findings of the referee will be found useful. These facts are not contradictory of those findings, and are recited in former decisions of this court, statutes of the United States, and of the State of California, and the records of the Interior Department, of all of which the court can take judicial notice.

The pueblo of San Francisco has been a fruitful subject of litigation for many years, both in the Land Department of the government and in the state and Federal courts. For the purposes of this case a brief history only of the litigation is deemed essential.

The city of San Francisco, as the successor of a Mexican pueblo of that name, presented its claim to the board of land commissioners created by the act of Congress approved March 3, 1851, for the confirmation to it of a tract of land to the extent of four square leagues, situated on the upper portion of the peninsula of San Francisco. In December, 1854, the board confirmed the claim for only a portion of the four square leagues, and both the city and the United States appealed to the District Court of the United States. The United States subsequently withdrew its appeal, but the case remained in the District Court undisposed of until September, 1864, when, under the provisions of the act of Congress of July 1, 1864, it was transferred to the United States Circuit Court, which sustained the contention of the city and entered a confirmatory decree in its favor on the 18th of May, 1865. 4 Sawyer, 553, 577. The language of that decree is as follows: "The land of which confirmation is made is a tract situated within the county of San Francisco, and embracing so much of the extreme upper portion of the peninsula above ordinary high-water mark, (as the same existed at the date of the conquest of the country, namely, the seventh of July, A.D. 1846,) on which the city of San Francisco is situated, as will contain an area of four square leagues — said tract being bounded on the north and east by the bay of San Francisco; on the west by the Pacific Ocean; and on the south by a due east and west line drawn so as to include the area aforesaid," subject to certain exceptions and deductions not necessary to be stated.

Both the United States and the city appealed from that decree — the United States from the whole decree, and the city from so much of it as included the aforesaid deductions and exceptions in the estimate of the quantity of land confirmed. While these appeals were pending Congress passed the act of March 8, 1866, "to quiet the title to certain lands within the corporate limits of the city of San Francisco." This act is as follows:

"*Be it enacted, etc.*, that all the right and title of the United States to the land situated within the corporate limits of the city of San Francisco, in the State of California, confirmed to the city of San Francisco by the decree of the Circuit Court of the United States for the northern district of California, entered on the eighteenth day of May, one thousand eight hundred and sixty-five, be, and the same are hereby, relinquished and granted to the said city of San Francisco and its successors, and the claim of the said city to said land is hereby confirmed, subject, however, to the reservations and exceptions designated in said decree, and upon the following trusts, namely, that all the said land, not heretofore granted to said city, shall be disposed of and conveyed by said city to parties in the *bona fide* actual possession thereof, by themselves or tenants, on the passage of this act, in such quantities and upon such terms and conditions as the legislature of the State of California may prescribe, except such parcels thereof as may be reserved and set apart by ordinance of said city for public uses: *Provided, however,* That the relinquishment and grant by this act shall not interfere with or prejudice any valid adverse right or claim, if such exist, to said land or any part thereof, whether derived from Spain, Mexico or the United States, or preclude a judicial examination and adjustment thereof." 14 Stat. 4, c. 13.

The appeals to this court were thereupon dismissed. The measure of the city's title to the four square leagues of land is to be found in the decree of confirmation and the act of Congress just recited. The question of the city's title having been settled, it became necessary to fix the boundaries of its lands by a survey. This duty, under the law, devolved upon the

political department of the general government having charge of the public lands. Accordingly, in 1867 and 1868, under instructions of surveyor general Upson, deputy surveyor Stratton made a survey of the confirmed claim, and the same was approved by the surveyor general, and subsequently, after lying in the General Land Office, at Washington, for about ten years, it was confirmed by the commissioner on the 11th of November, 1878. 2 C. L. L. 1234. In making this survey Stratton ran its lines along the line of ordinary high-water mark of the bay of San Francisco until he came to Mission Creek, a small stream or estuary of the bay, and then followed the tide line up the creek, and crossing over, ran down on the other side. This plan seems also to have been followed with reference to a few other small estuaries. The city protested against this method of survey, and, through her attorney of record, gave notice of appeal from the action of the Commissioner of the General Land Office to the Secretary of the Interior, claiming that the proper method of running the line along the bay was to follow the tide line of the main body of water and cut across the mouths of all estuaries or creeks which are arms of the bay. The board of supervisors of the city, however, decided not to appeal from the decision of the Commissioner of the General Land Office confirming the Stratton survey, and, declaring that the action of the attorney was unauthorized, discharged him. Thereafter the board passed a resolution, addressed to the Secretary of the Interior, in which it was stated that, in its opinion, the Stratton survey was entirely correct and legal, and should be approved.

Notwithstanding this action of the board, the Secretary of the Interior sent for the papers in the case, and, upon an elaborate examination of the points involved, reversed the action of the Commissioner of the General Land Office approving the Stratton survey, thus substantially sustaining the original protest of the city to the running of the boundary line of the grant up the estuaries of the bay.

Upon motion for review, a subsequent Secretary of the Interior sustained the action of his predecessor, and ordered a survey made in conformity with the views of the department.

2 Land Dec. 346. It was under those instructions that the Von Leicht survey was made, upon which the patent was issued. Subsequently an application was made to a succeeding Secretary to have the patent recalled and cancelled, and a new patent issued; but it was denied, the Secretary holding that he had no power under the law to grant the application, and that even if he had, he should decline to exercise it, because he considered the views of his predecessors sound and correct. 5 Land Dec. 483.

*Mr. Edward R. Taylor* for plaintiff in error. *Mr. Samuel M. Wilson* was with him on the brief.

*Mr. Charles N. Fox* for defendants in error. *Mr. Philip G. Galpin* was with him on the brief, in which were cited: *United States* v. *Minor*, 114 U. S. 233; *Railroad Co.* v. *Schurmeir*, 7 Wall. 272; *Jones* v. *Martin*, 13 Sawyer, 314, 317; *Smelting Co.* v. *Kemp*, 104 U. S. 636; *Wright* v. *Roseberry*, 121 U. S. 488; *Tubbs* v. *Wilhoit*, 138 U. S. 134; *Doolan* v. *Carr*, 125 U. S. 618; *Manning* v. *San Jacinto Tin Co.*, 7 Sawyer, 418, 427; *West* v. *Cochran*, 17 How. 403; *Stanford* v. *Taylor*, 18 How. 409; *Willott* v. *Sandford*, 19 How. 79; *Davis* v. *Wiebold*, 139 U. S. 507; *Attorney General* v. *Chambers*, 4 DeG. M. & G. 206; *Teschemacher* v. *Thompson*, 18 California, 11; *S. C.* 79 Am. Dec. 151.

*Mr. Galpin* also filed the following points for defendants.

I. The political department of the government known as the Department of the Interior has no power to carry into effect the provisions of the Treaty of Guadalupe Hidalgo, except in so far as that power is conferred by acts of Congress. No power in that regard is given save by the act of March 3, 1851, relative to settlement of private land claims and the acts amendatory thereof. 9 Stat. 631; 13 Stat. 332, § 7; 14 Stat. 218.

II. The Department of the Interior is not authorized to order a patent for land to any Mexican citizen or his successors in interest, in satisfaction of the treaty, except of land that has first been confirmed to that citizen by the judicial tribunals

appointed by Congress to ascertain and settle private land claims arising under the treaty.

III. Where a tract of land limited by specific boundaries has been so confirmed by the judicial tribunals authorized by Congress, a patent which includes lands (not public lands of the United States) outside of the boundaries given in the decree, does not operate to pass title to such outside lands.

IV. The patent is presumptive and persuasive evidence that its courses and distances do follow the specific boundary of the decree; but it is not conclusive.

The contestant in ejectment may prove to the trial court if he can, that the officer has exceeded his jurisdiction; and that the land included in the patent is in truth outside of the grant confirmed, and, therefore, outside the conveying power.

To deny this is to assert simply that the Department of the Interior, without authority to adjudicate upon what land shall be confirmed or conveyed, may issue a patent to land not confirmed; and the conveyance passes title to the outside land, until and unless the party affected by the overlap shall bring suit to cancel that part of the description, and reform the patent. That is to say, a patent to land outside of the jurisdiction of the officer, conclusively proves that the land is within it. So that, if the decree confirms the peninsula of San Francisco, the land office may patent the city of Oakland, and the patent passes the title to the land in the latter city! If this be so, the patent becomes more potent than the decree, and the court becomes an appendage of the land office.

V. If the court has confirmed a Spanish grant for a certain number of leagues to be located within certain larger exterior boundaries, (as has often occurred in this State,) the court by its decree has confirmed the grant to every part of the land up to the exterior boundaries, and the whole of that land is placed within the jurisdiction of the land office for the purpose of surveying and patenting the number of acres allotted to the claimant. This duty although in a measure judicial, (where no restriction of specific boundaries is contained in the decree,) is chiefly ministerial, and may be exercised anywhere within the exterior boundaries.

It results that so long as the survey and the patent are restricted to land within the exterior boundaries, the land is within the conveying power of the officer. It has been placed within his grasp by the decree of the court.

VI. But if a river, the sharp crest of a mountain ridge or the overflowing surface of the bay, impinging on the shore, defines the exterior boundary of the grant and the decree allots to the claimant, for instance, four square leagues in a square form lying next north and west of the specific boundary, and the surveyor chooses to patent land outside of the exterior boundary, and south and east of it, the land so patented, not being public land of the United States and unconfirmed to the claimant, is not within the conveying power of the officer.

Such is precisely this case ; the land confirmed was no more than "so much of the extreme upper portion of the peninsula" "above ordinary high-water mark," and within an east and west, southern boundary line "as will contain" four leagues.

The surveyor, knowingly and remonstrating, was compelled, by order of the Secretary of the Interior, to cross this line and go outside of the exterior boundary of the land confirmed. The patent covered land which had not been the property of the United States after the admission of California into the Union in September, 1850.

VII. Nor is it any answer to say that notwithstanding the admission of California into the Union, she did not take this property discharged of the right of the government to use it, if necessary, in liquidation of the obligations of the treaty. Grant that this was so ; still California did take the fee without grant and without patent, by virtue of her sovereignty, in September, 1850, subject to the right of the government to take it from her for the purposes aforesaid. But the government has not required it for that purpose ; on the contrary, the decree of confirmation effectually removed that lien from the title of the State. It results that land below high tide was not within the conveying power of the Land Department, and the title of the State was not affected by the patent.

VIII. It will be said, "that the specific line of 'high-water mark' yields to the more general description of 'the bay :'

that, according to all the principles of map-making, a bay takes the contour line of the coast, and that, as the land is designated as lying between the ocean and the bay, the more general description of 'the bay' controls the words 'embracing so much of the extreme upper portion of the peninsula above high-water mark, etc., on which the city of San Francisco is situated, as will contain, etc.,' that the shore line of the bay does not follow the line of high tide; and the latter is to be abandoned."

It is manifest from the decree that the words " ocean " and " bay " are words of general description. The shores of each are described by the " line of ordinary high tide." There is no such thing possible as bay shore line visible under water. The result of this interpretation is, that the specific boundary of the line of high tide is eliminated whenever the surveyor chooses to depart from it. If such a construction is admissible at one point, it is of necessity at all others.

He may run anywhere from point to point and from headland to headland, and include the land of the State wherever he is disposed so to do. The result would be, possibly, that he would touch the line of high tide only at the extreme points which jutted into the sea, commencing at the Presidio and ending at the Potrero.

He could have disturbed the title to the water front of the city. An unknown, invisible and shifting boundary of a contour line which may be run this way a mile or two, or that way a mile or two, at the caprice of the surveyor, was not a desirable boundary for the city; and none such was then intended.

IX. The real and only question presented by this record is as to the exclusive and conclusive evidence of the patent. When the plaintiff in ejectment has located his land beyond the specific boundary given in the decree by evidence unassailed, does a patent to land unconfirmed to the claimant override all contrary proof, and conclusively establish that this patent is valid outside the boundaries of the decree, and that this land was confirmed to the claimant?

Mr. Justice Lamar, after stating the case, delivered the opinion of the court.

The case as presented by this record involves some very interesting questions. Ever since the decision in *Polk's Lessee* v. *Wendall*, 9 Cranch, 87, it has been the settled law of this court that a patent is void at law if the grantor State had no title to the premises embraced in it, or if the officer who issued the patent had no authority so to do, and that the want of such title or authority can be shown in an action at law. *Patterson* v. *Winn*, 11 Wheat. 380, 384; *Stoddard* v. *Chambers*, 2 How. 284, 318; *Easton* v. *Salisbury*, 21 How. 426; *Reichart* v. *Felps*, 6 Wall. 160; *Best* v. *Polk*, 18 Wall. 112; *Smelting Co.* v. *Kemp*, 104 U. S. 636; *Steel* v. *Smelting Co.*, 106 U. S. 447, 453; *Wright* v. *Roseberry*, 121 U. S. 488, 519; *Doolan* v. *Carr*, 125 U. S. 618, 625, and authorities there cited.

It is sought by the plaintiffs to bring this case within that rule; and it is, therefore, strenuously insisted that the patent for the San Francisco pueblo is void to the extent that it embraces lands below ordinary high-water mark of Mission Creek, as that line existed at the date of the conquest from Mexico in 1846. In order to sustain this proposition the claim is put forth that the Stratton survey was correct, and was never legally set aside; that the Von Leicht survey, upon which the patent was issued, was wholly unauthorized in law and void; and that the premises in dispute being excluded by the Stratton survey, and being proved by parol evidence to have been below the line of ordinary high-water mark, were never legally included in the patent, and were not included in the decree of confirmation.

It is a well settled rule of law that the power to make and correct surveys of the public lands belongs exclusively to the political department of the government, and that the action of that department, within the scope of its authority, is unassailable in the courts except by a direct proceeding. *Cragin* v. *Powell*, 128 U. S. 691, 699, and cases cited. Under this rule it must be held that the action of the Land Department in determining that the Von Leicht survey correctly delineated

the boundaries of the pueblo grant, as established by the confirmatory decree, is binding in this court, if the Department had jurisdiction and power to order that survey. It is claimed, however, and the referee so determined, that no such power or authority existed in the Department, because it had been exhausted by the action of the Commissioner of the General Land Office in approving and confirming the Stratton survey in 1878. This contention is based upon the proposition that the Secretary of the Interior had no authority to set aside the order of the Commissioner approving and confirming the Stratton survey, especially in view of the fact that no appeal was taken from such order and the authorities of the city acquiesced in that survey. This proposition is unsound. If followed as a rule of law, the Secretary of the Interior is shorn of that supervisory power over the public lands which is vested in him by section 441 of the Revised Statutes. That section provides as follows: "The Secretary of the Interior is charged with the supervision of public business relating to the following subjects: . . . Second. The public lands, including mines." Sec. 453 provides: "The Commissioner of the General Land Office shall perform, *under the direction of the Secretary of the Interior*, all executive duties appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands, and also such as relate to private claims of land, and the issuing of patents for all [*agents*] [grants] of land under the authority of the government." Sec. 2478 provides: "The Commissioner of the General Land Office, *under the direction of the Secretary of the Interior*, is authorized to enforce and carry into execution, by appropriate regulations, every part of the provisions of this title [The Public Lands] not otherwise specially provided for."

The phrase, "under the direction of the Secretary of the Interior," as used in these sections of the statutes, is not meaningless, but was intended as an expression in general terms of the power of the Secretary to supervise and control the extensive operations of the Land Department of which he is the head. It means that, in the important matters relating to the sale and disposition of the public domain, the surveying of

private land claims and the issuing of patents thereon, and the administration of the trusts devolving upon the government, by reason of the laws of Congress or under treaty stipulations, respecting the public domain, the Secretary of the Interior is the supervising agent of the government to do justice to all claimants and preserve the rights of the people of the United States. As was said by the Secretary of the Interior on the application for the recall and cancellation of the patent in this pueblo case (5 Land Dec. 494): "The statutes in placing the whole business of the Department under the supervision of the Secretary, invest him with authority to review, reverse, amend, annul or affirm all proceedings in the Department having for their ultimate object to secure the alienation of any portion of the public lands, or the adjustment of private claims to lands, with a just regard to the rights of the public and of private parties. Such supervision may be exercised by direct orders or by review on appeals. The mode in which the supervision shall be exercised in the absence of statutory direction may be prescribed by such rules and regulations as the Secretary may adopt. When proceedings affecting titles to lands are before the Department the power of supervision may be exercised by the Secretary, whether these proceedings are called to his attention by formal notice or by appeal. It is sufficient that they are brought to his notice. The rules prescribed are designed to facilitate the Department in the despatch of business, not to defeat the supervision of the Secretary. For example, if, when a patent is about to issue, the Secretary should discover a fatal defect in the proceedings, or that by reason of some newly ascertained fact the patent, if issued, would have to be annulled, and that it would be his duty to ask the Attorney General to institute proceedings for its annulment, it would hardly be seriously contended that the Secretary might not interfere and prevent the execution of the patent. He could not be obliged to sit quietly and allow a proceeding to be consummated, which it would be immediately his duty to ask the Attorney General to take measures to annul. It would not be a sufficient answer against the exercise of his power that no appeal had been taken to him and therefore he was without authority in the matter."

There is authority in this court for this holding. *Magwire* v. *Tyler*, 1 Black, 195, was a case involving the right of the Commissioner of the General Land Office, under the act of July 4, 1836, 5 Stat. 107, c. 352, reorganizing that bureau, and of the Secretary of the Interior, under the act of March 3, 1849, 9 Stat. 395, establishing that department, to take jurisdiction of surveys made in the upper Louisiana country upon confirmed Spanish titles. One of the questions presented was whether the Secretary of the Interior could reject such a survey and order a new one of the same claim, and issue a patent upon the second survey. By the act of March 3, 1807, the board of commissioners appointed to pass upon the merits of such claims was required to deliver to each party whose claim was confirmed a certificate that he was entitled to a patent for the tract of land designated. This certificate was to be presented to the surveyor general, who proceeded to have the survey made and returned, with the certificate, to the recorder of land titles, whose duty it was to issue a patent certificate, which, being transmitted to the Secretary of the Treasury, (then the head of the Land Department,) entitled the party to a patent. By the act of April 25, 1812, the duty of the Secretary of the Treasury was transferred to the Commissioner of the General Land Office. The act of April 18, 1814, required that accurate surveys should be made, according to the description in the certificate of confirmation, and that proper returns should be made to the Commissioner, of the certificate and survey, and of all such other evidence as the Commissioner might require. The court said: " These acts show that the surveys and proceedings must be, in regard to their correctness, within the jurisdiction of the Commissioner; and such has been the practice. Of necessity he must have power to adjudge the question of accuracy preliminary to the issue of a patent."

After referring to the act of July 4, 1836, which conferred plenary powers on the Commissioner to supervise all surveys of public lands, " and also such as relate to private claims of land and the issuing of patents," and also to the act of March 3, 1849, the third section of which vested the Secretary of the

Interior, in matters relating to the General Land Office, including the power of supervision and appeal, with the same powers that were formerly discharged by the Secretary of the Treasury, the court said: "The jurisdiction to revise on the appeal was necessarily coextensive with the powers to adjudge by the Commissioner. We are, therefore, of the opinion that the Secretary had authority to set aside Brown's survey of Labeaume's tract, order another to be made, and to issue a patent to Labeaume, throwing off Brazeau's claim." 1 Black, 202. See also *S. C.* 8 Wall. 650, 661.

A similar question arose in *Snyder* v. *Sickles*, 98 U. S. 203, 211, and was decided in the same way, the court going into an elaborate examination of the powers of the Secretary of the Interior to review the action of the Commissioner of the General Land Office, and reaffirming the doctrines of *Magwire* v. *Tyler*.

In *Buena Vista County* v. *Iowa Falls & Sioux City Railroad*, 112 U. S. 165, 175, a question arose whether the decision of the Commissioner of the General Land Office under the act of March 5, 1872, 17 Stat. 37, was intended to be final, from which no appeal would lie to the Secretary of the Interior. That act provides: "That the Commissioner of the General Land Office is hereby authorized and required to receive and examine the selections of swamp lands in Lucas, O'Brien, Dickinson and such other counties in the State of Iowa as formerly presented their selections to the surveyor general of the district including that State, and allow or disallow said selections and indemnity provided for according to the acts of Congress in force touching the same at the time such selections were made, without prejudice to legal entries and rights of *bona fide* settlers under the homestead or preëmption laws of the United States at the date of this act." It is to be observed that there was nothing in that act expressly giving an appeal from the Commissioner's decision to the Secretary. But the court said: "There is nothing in the act which alters the relation between the two officers as otherwise established, or puts the decisions of the Commissioner, under that act, upon a footing different from his other decisions."

The powers and duties of the Secretary of the Interior were no greater under the acts under consideration in the cases to which we have referred than they are under sections 441, 453 and 2478 of the Revised Statutes. They were practically, and to all intents and purposes, the same. The general words of those sections are not supposed to particularize every minute duty devolving upon the Secretary and every special power bestowed upon him. There must be some latitude for construction. In the language of this court in the late case of *Williams* v. *United States,* 138 U. S. 514, 524: "It is obvious, it is common knowledge, that in the administration of such large and varied interests as are intrusted to the Land Department, matters not foreseen, equities not anticipated, and which are, therefore, not provided for by express statute, may sometimes arise, and, therefore, that the Secretary of the Interior is given that superintending and supervising power which will enable him, in the face of these unexpected contingencies, to do justice." See also *Lee* v. *Johnson,* 116 U. S. 48.

It makes no difference whether the appeal is in regular form according to the established rules of the Department, or whether the Secretary on his own motion, knowing that injustice is about to be done by some action of the Commissioner, takes up the case and disposes of it in accordance with law and justice. The Secretary is the guardian of the people of the United States over the public lands. The obligations of his oath of office oblige him to see that the law is carried out, and that none of the public domain is wasted or is disposed of to a party not entitled to it. He represents the government, which is a party in interest in every case involving the surveying and disposal of the public lands.

Furthermore, the power of supervision and control exercised by the Secretary of the Interior over all matters relating to the disposition and sale of the public lands, under § 453, Rev. Stat., is substantially the same as his power over the Bureau of Pensions, under § 471. That section provides: "The Commissioner of Pensions shall perform, *under the direction of the Secretary of the Interior,* such duties in the execution of the

various pension and bounty laws as may be prescribed by the President."

There is nowhere any express power given to the Secretary of the Interior to hear and determine appeals from the Commissioner of Pensions; and yet the power is exercised daily without question. And such power was expressly asserted in *United States ex rel. Dunlap* v. *Black*, 128 U. S. 40, and impliedly recognized in *Miller* v. *Raum*, 135 U. S. 200.

The same remarks apply to the powers of the Secretary of the Interior, under a similarly worded section of the Revised Statutes, (§ 463,) to supervise and control the management of the Bureau of Indian Affairs, which powers, so far as we are advised, have never been questioned.

But even if there was any doubt of the existence of such power in the Secretary of the Interior, as an original proposition, still the exercise of it for so long a period — going back to the organization of that department — without question, ought to be considered as conclusive as to the existence of the power. *Hastings & Dakota Railroad* v. *Whitney*, 132 U. S. 357, and authorities there cited.

We conclude, on this branch of the case, that the Secretary of the Interior had ample power to set aside the Stratton survey and order a new survey by Von Leicht; and that his action in such matter is unassailable in the courts in a collateral proceeding. The Von Leicht survey, therefore, must be held as a correct survey of the pueblo claim as confirmed by the Circuit Court. Moreover, the method of running the shore line of the bay of San Francisco, adopted by the Von Leicht survey, was approved by the Circuit Court itself in *Tripp* v. *Spring*, 5 Sawyer, 209; and on this point we entertain no doubt.

The only remaining question in the case, as we understand it, and as we desire to consider it, may be thus stated: Admitting that the Von Leicht survey is correct and follows the decree of confirmation; admitting, also, that the patent followed the survey and the decree, and that the premises in dispute are embraced in the patent: Was parol evidence admissible to show that these premises were below the ordinary

high-water mark — not of the bay of San Francisco, but of *Mission Creek*, a navigable arm of the bay, as that line existed at the date of the conquest from Mexico in 1846 ? The contention on this branch of the case is, that, if all these admissions be taken as true, yet the land in dispute never was a portion of the pueblo of San Francisco, because, at the date of the conquest, it was below the ordinary high-water mark of Mission Creek, and, therefore, upon the admission of California into the Union in 1850, passed to the State in virtue of its sovereignty over tide lands.

To this contention we cannot give our assent; and in the view which we take of the question, we think there was error in admitting evidence to show that the land was below high-water mark of the creek, and that the Supreme Court erred in sustaining this ruling. For this and other reasons hereinbefore stated the judgment should have been for the defendant. ·

It is the settled rule of law in this court that absolute property in, and dominion and sovereignty over, the soils under the tide waters in the original States were reserved to the several States, and that the new States since admitted have the same rights, sovereignty and jurisdiction in that behalf as the original States possess within their respective borders. *Martin* v. *Waddell*, 16 Pet. 367, 410; *Pollard* v. *Hagan*, 3 How. 212, 229; *Goodtitle* v. *Kibbe*, 9 How. 471, 478; *Mumford* v. *Wardwell*, 6 Wall. 423, 436; *Weber* v. *Harbor Commissioners*, 18 Wall. 57, 65. Upon the acquisition of the territory from Mexico the United States acquired the title to tide lands equally with the title to upland; but with respect to the former they held it only in trust for the future States that might be erected out of such territory. Authorities last cited. But this doctrine does not apply to lands that had been previously granted to other parties by the former government, or subjected to trusts which would require their disposition in some other way. *San Francisco* v. *Le Roy*, 138 U. S. 656. For it is equally well settled that when the United States acquired California from Mexico by the treaty of Guadalupe Hidalgo, 9 Stat. 922, they were bound, under the 8th article of that treaty, to protect all rights of property in

that territory emanating from the Mexican government pre-
vious to the treaty. *Teschemacher* v. *Thompson*, 18 California,
11; *Beard* v. *Federy*, 3 Wall. 478.

Irrespective of any such provision in the treaty, the obliga-
tions resting upon the United States in this respect, under the
principles of international law, would have been the.same.
*Soulard* v. *United States*, 4 Pet. 511; *United States* v. *Perche-
man*, 7 Pet. 51, 87; *Strother* v. *Lucas*, 12 Pet. 410, 436; *United
States* v. *Repentigny*, 5 Wall. 211, 260.

These observations lead directly to the determination of
the force and effect of the title of the pueblo of San Francisco,
derived from the former government of Mexico, as opposed to
the title which it is insisted passed to the State of California
upon its admission into the Union by virtue of its sovereignty
over all tide lands in the State below the high-water line, even
including such as are situated within the limits of the pueblo.

If we have succeeded in showing that the tract in dispute
was part of the land claimed by the city of San Francisco as
successor of the Mexican pueblo of that name; that it is
within the four square leagues described in the decree of the
United States Circuit Court for the district of California,
entered May 18, 1865; that that court decided and decreed
that the claim of title was valid under the laws of Mexico;
that the official survey of the United States officers is correct
and followed the decree of confirmation; and that the patent
of the government of the United States, following the survey
and.decree, embraced within its calls the property in dispute;
we think it clearly follows that the patent of the government
is evidence of the title of the city under Mexican laws, and is
conclusive, not only as against the government and against all
parties claiming under it by titles subsequently acquired, but
also as against all parties except those who have a full and
complete title acquired from Mexico anterior in date to that
confirmed by the decree of confirmation. This conclusion is
fully sustained by the decisions of this court.

The case of *San Francisco* v. *Le Roy*, 138 U. S. 656, 670,
672, is directly in point. That was a bill by Le Roy against
the city of San Francisco to quiet his title to certain property

within the limits of the city.   The plaintiff below claimed at the trial the benefit of a deed of the land from the tide-land commissioners of the State, which purported, for a consideration of $352.80, to release to the grantee the right, title and interest of the State of California to the premises therein described.   The city relied on the patent of the government based on the confirmation of the United States Circuit Court for the district of California.

The court held that the title of the city rests upon the decree of the court recognizing the title to the four square leagues of land, and establishing their boundaries; and that even if there were any tide lands within the pueblo the power and duty of the United States under the treaty to protect the claims of the city of San Francisco as successor to the pueblo were superior to any subsequently acquired rights of California over the tide lands.   Upon the question involved the court said:

"We do not attach any importance, upon this question of reservation, to the deed of the tide-land commissioners, executed to Sullivan on the 3d of December, 1870, for the State did not at that time own any tide or marsh lands within the limits of the pueblo as finally *established by the Land Department.*   All the marsh lands, so called, which the State of California ever owned, were granted to her by the act of Congress of September 28, 1850, known as the Swamp Land Act, by which the swamp and overflowed lands within the limits of certain States, thereby rendered unfit for cultivation, were granted to the States to enable them to construct the necessary levees and drains to reclaim them.   9 Stat. c. 84, p. 519.   The interest of the pueblo in the lands within its limits goes back to the acquisition of the country, and precedes the passage of that act of Congress.   And that act was never intended to apply to lands held by the United States charged with any equitable claims of others, which they were bound by treaty to protect.   As to tide lands, although it may be stated as a general principle — and it was so held in *Weber* v. *Board of Harbor Commissioners,* 18 Wall. 57, 65 — that the titles acquired by the United States to lands in California under tide

waters, from Mexico, were held in trust for the future State, so that their ownership and right of disposition passed to it upon its admission into the Union, that doctrine cannot apply to such lands as had been previously granted to other parties by the former government, or subjected to trusts which would require their disposition in some other way. When the United States acquired California it was with the duty to protect all the rights and interests which were held by the pueblo of San Francisco under Mexico. The property rights of pueblos equally with those of individuals were entitled to protection, and provision was made by Congress in its legislation for their investigation and confirmation. *Townsend* v. *Greely*, 5 Wall. 326, 337. The duty of the government and its power in the execution of its treaty obligations to protect the claims of all persons, natural and artificial, and, of course, of the city of San Francisco as successor to the pueblo, were superior to any subsequently acquired rights or claims of the State of California, or of individuals. The confirmation of the claim of the city necessarily took effect upon its title as it existed upon the acquisition of the country. In confirming it, the United States, through its tribunals, recognized the validity of that title at the date of the treaty — at least, recognized the validity of the claim to the title as then existing, and in execution of its treaty obligations no one could step in between the government of the United States and the city seeking their enforcement. It is a matter of doubt whether there were any lands within the limits of the pueblo, as defined and established by the Land Department, that could be considered tide lands, which, independently of the pueblo, would vest in the State. The lands which passed to the State upon her admission to the Union were not those which were affected occasionally by the tide, but only those over which tide water flowed so continuously as to prevent their use and occupation. To render lands tide lands, which the State by virtue of her sovereignty could claim, there must have been such continuity of the flow of tide water over them, or such regularity of the flow within every twenty-four hours, as to render them unfit for cultivation, the growth of grasses or other uses to which upland

is applied. But even if there were such lands, their existence could in no way affect the rights of the pueblo. Its rights were dependent upon Mexican laws, and when Mexico established those laws she was the owner of tide lands as well as uplands, and could have placed the boundaries of her pueblos wherever she thought proper. It was for the United States to ascertain those boundaries when fixing the limits of the claim of the city, and that was done after the most thorough and exhaustive examination ever given to the consideration of the boundaries of a claim of a pueblo under the Mexican government. After hearing all the testimony which could be adduced, and repeated arguments of counsel, elaborate reports were made on the subject by three Secretaries of the Interior. They held, and the patent follows their decision, that the boundary of the bay, which the decree of confirmation had fixed as that of ordinary high-water mark, as it existed on the 7th of July, 1846, crosses the mouth of all creeks entering the bay. There was, therefore, nothing in the deed of the tide-land commissioners which could by any possibility impair the right of the city to exercise the power reserved in the Van Ness ordinance over such portions of the lands conveyed to occupants under that ordinance as had been occupied or set apart for streets, squares and public buildings of the city. Such a reservation should have been embodied in the decree in this case."

In the case of *Beard* v. *Federy*, 3 Wall. 478, 491, the court, upon a question very similar to this in many of its aspects, followed a similar course of reasoning from which we think the conclusion we have reached is logically deducible. In that case the court uses the following language:

"The position of the defendants is, that as against them the patent is not evidence for any purpose; that as between them and the plaintiff the whole subject of title is open precisely as though no proceedings for the confirmation had been had, and no patent for the land had been issued. Their position rests upon a misapprehension of the character and effect of a patent issued upon a confirmation of a claim to land under the laws of Spain and Mexico.

" In the first place, the patent is a deed of the United States. As a deed its operation is that of a quit-claim, or rather a conveyance of such interest as the United States possessed in the land, and it takes effect by relation at the time when proceedings were instituted by the filing of the petition before the Board of Land Commissioners.

" In the second place, the patent is a record of the action of the government upon the title of the claimant as it existed upon the acquisition of the country. Such acquisition did not affect the rights of the inhabitants to their property. They retained all such rights, and were entitled by the law of nations to protection in them to the same extent as under the former government. The treaty of cession also stipulated for such protection. The obligation to which the United States thus succeeded was, of course, political in its character, and to be discharged in such manner, and on such terms, as they might judge expedient. By the act of March 3, 1851, they have declared the manner and the terms on which they will discharge this obligation. They have there established a special tribunal, before which all claims to land are to be investigated; required evidence to be presented respecting the claims; appointed law officers to appear and contest them on behalf of the government; authorized appeals from the decisions of the tribunal, first to the District and then to the Supreme Court'; and designated officers to survey and measure off the land when the validity of the claims is finally determined. When informed, by the action of its tribunal, and officers, that a claim asserted is valid and entitled to recognition, the government acts, and issues its patent to the claimant. This instrument is, therefore, record evidence of the action of the government upon the title of the claimant. By it the government declares that the claim asserted was valid under the laws of Mexico ; that it was entitled to recognition and protection by the stipulations of the treaty, and might have been located under the former government, and is correctly located now, so as to embrace the premises as they are surveyed and described. As against the government, this record, so long as it remains unvacated, is conclusive. And it is equally conclu-

sive against parties claiming under the government by title subsequent. It is in this effect of the patent as a record of the government that its security and protection chiefly lie. If parties asserting interests in lands acquired since the acquisition of the country could deny and controvert this record, and compel the patentee, in every suit for his land, to establish the validity of his claim, his right to its confirmation and the correctness of the action of the tribunals and officers of the United States in the location of the same, the patent ·would fail to be, as it was intended it should be, an instrument of quiet and· security to its possessor. The patentee would find his title recognized in one suit and rejected in another, and if his title were maintained, he would find his land located in ·as many different places as the varying prejudices, interests or notions of justice of witnesses and jurymen might suggest. Every fact upon which the decree and patent rests would be open to contestation. The intruder, resting solely upon his possession, might insist that the original claim was invalid, *or was not properly located*, and, therefore, he could not be disturbed by the patentee. No construction which will lead to such results can be given to the fifteenth section [meaning the fifteenth section of the act of 1851, for the purpose of ascertaining and settling private land claims in California]. The term 'third persons,' as there used, does not embrace all persons other than the United States and the claimants, but only those who hold superior titles, such as will enable them to resist successfully any action of the government in disposing of the property."

*Judgment reversed, and cause remanded with directions for further proceedings in conformity with this opinion.*

Mr. Justice Field, concurring.

I concur in the judgment of this court and in the views expressed in its opinion. As a correct solution of the questions involved is. of vital importance to the security of titles claimed ·under confirmed Mexican grants in California, followed by a survey made and a patent issued under the Land Department of the government, and as I have had personal knowledge of

all legal proceedings touching the claim of the pueblo of San
Francisco from their commencement, I will venture to make
some observations, in addition to those of my brethren, upon
the propositions of law advanced by the court below. Those
propositions, if maintained, would, in my judgment, unsettle
titles held under patents issued upon such confirmed grants,
and lead to great litigation in the State, to the serious detri-
ment of its interests and those of its people.

The action is ejectment for the possession of certain prem-
ises within the limits of the city and county of San Francisco,
and also within the boundaries of the tract of land confirmed
to the city, as successor of a Mexican pueblo, as they are de-
scribed in the official survey of the tract made under the
direction and authority of the Land Department, and carried
into the patent of the United States.

The tract confirmed is designated in the decree of confirma-
tion rendered by the Circuit Court of the United States on the
18th of May, 1865, as "a tract situated within the county of
San Francisco, and embracing so much of the extreme upper
portion of the peninsula, *above ordinary high-water mark,* (as
the same existed at the date of the acquisition of the country,
namely, the seventh day of July, A.D. 1846,) on which the city
of San Francisco is situated as will contain an area of four
square leagues; said tract being bounded on the north and
east *by the bay of San Francisco;* on the west by the Pacific
Ocean, and on the south by a due east and west line drawn so
as to include the area aforesaid," subject to certain deductions
not material to be mentioned here. The decree declares that
the "confirmation is in trust for the benefit of the lot holders
under grants from the pueblo, town or city of San Francisco,
or other competent authority, and as to any residue, in trust
for the use and benefit of the inhabitants of the city."

A survey and plat purporting to be of the tract were made
by one Stratton, a deputy of the surveyor general of the
United States for California, and was approved by the latter
officer in August, 1868. The survey, instead of following
from its commencement on the east side of the tract to its ter-
mination the line of ordinary high-water mark of the bay of

San Francisco, as it existed on the 7th of July, 1846, followed such line only a part of the way. Of its departures from that line it is sufficient to mention that, when the survey reached the mouth of the estuary or stream entering the bay, known as Mission Creek, it left the shore of the bay and ran up along the bank of the creek on its right side from its entrance for a distance of over a mile, then crossing the creek passed down on the other side to the bay, extending back from the creek on each side so as to exclude from the survey a large tract of what was called marsh land.

To the approval of the survey and plat, the city and county of San Francisco filed their protest and objections. The military officer of the United States in command of the Department of California also filed objections to so much of the survey as related to the military reservation within the limits of the tract.

Surveyor General Day succeeded the officer who had approved the survey, and he forwarded the protest and objections to the Commissioner of the General Land Office, accompanied by his opinion that the objections were well taken in several particulars, and recommended among other things that the plat and survey should be amended so as to include the marsh land lying on Mission Creek within the four square leagues, and by the resurvey of the southern and eastern boundary of the military reservation. The Commissioner, however, disregarded the objections and approved the survey, founding his conclusion upon the alleged long acquiescence of the city and county of San Francisco, from which he inferred a recognition of its correctness and a waiver of the protest and objections.

The confirmation was, as already stated, "in trust for the benefit of the lot-holders under grants from the pueblo, town or city of San Francisco, or other competent authority, and as to any residue, in trust for the use and benefit of the inhabitants of the city." The legislation of Congress releasing the interest of the United States to the city was also in trust for the beneficiaries named, (14 Stat. 4, c. 13;) so that the city of San Francisco had no interest in the lands within the confirmed tract other than as a trustee, except where parcels had been

acquired by purchase or conveyance from other sources than the pueblo. All pueblo lands she held simply in that character. It was incumbent upon her, therefore, to take such steps as were necessary to secure and perfect the title of her *cestuis que trust*. She accordingly retained counsel to protect their interests as well as her own, and he made a formal appeal for the benefit of both to the Secretary of the Interior from the decision of the Commissioner.

Certain lot-holders were also permitted to appear before the Secretary and argue the case, as parties interested in the title. An appeal was also taken by the military commander of the Department, on behalf of the United States, to correct alleged errors in the survey of the military reservation, which kept the whole survey open before the Secretary until it was finally determined. Any change, either by the enlargement or diminution of the reservation, necessarily affected other lines of the survey, reducing or extending them as the quantity embraced within the tract surveyed was increased or diminished.

Mr. Schurz was then at the head of the Interior Department, and he examined at great length the action of the Commissioner and of the surveyor general upon the survey; received a large amount of testimony upon the objections presented, and heard arguments of counsel thereon. And he held that the treatment of the survey by the Commissioner proceeded on the assumption that the United States had no interest in the matter, and that if the State and city were satisfied, the duty of the Department was to approve the survey. This the Secretary held to be a grave error, observing that if the excluded tracts which the city claimed under the protest were above high-water mark in 1846, they ought to be included in the survey, and then the southern boundary line would have to be moved further north, excluding a corresponding quantity which would fall into the public lands of the United States. No stipulation or agreement, therefore, said the Secretary, between the State and the city and county could estop or relieve the officers of the Department from the duty of executing the decree. or of protecting the interests of the government, adding, that if the city and county should ask to withdraw the protest

or to have the same dismissed the government would still have the right to make use of the objections, and of the evidence filed in their support for its own protection as well as for properly surveying the claim in accordance with the decree. He therefore discarded entirely the ground which the Commissioner had advanced as the principal reason for approving the survey.

The protest and objections of the city and county referred to tracts of marsh land lying near and south of Mission Creek. They alleged that such lands were not overflowed by tide water, except at the spring tides; that the line of ordinary high-water mark upon them on the side of the bay was sharply defined by a growth of samphire, a marine reedy plant which grows down to such line and no further. The testimony before the Secretary showed that the line thus defined was traced with a blue pencil on the engraved map of the coast survey, made by officers of the United States between 1850 and 1857, and that the marsh lands, including the premises in controversy, were above the line thus designated. Testimony of old residents of San Francisco, some of whom had resided there as early as 1842 and others in 1849, and down to a period long after 1851, and were familiar with the character of the land fronting on the bay, corroborated from their personal knowledge the evidence of this map, as to the marsh lands excluded from the survey being above the ordinary line of high-water mark of the bay.

It also appeared before the Secretary, that by an act of the legislature of California, passed March 26, 1851, the State had granted to the city of San Francisco the use and occupation for ninety-nine years of certain lands designated as beach and water lots; and that in describing those lands it had made one of their boundaries the natural high-water mark of the bay, the line of such high-water mark extending to its point of intersection with the southern boundary of the city. The act provided that, within thirty days after its passage, the city of San Francisco should deposit in the offices of the secretary of State and of the surveyor general, and in the office of the surveyor of the city of San Francisco, "a correct map of

said boundary line, distinctly and properly delineated by a red line."

Such maps were made and deposited as required, and from that time afterwards they were referred to by all parties in the city as determining the true line of ordinary high-water mark as it had previously existed.   A copy of one of them was before the Secretary.   They represented, as he held, the line of ordinary high-water mark which had been established, sanctioned and recognized in the most solemn manner by the State and city for years, and was the best available evidence of ordinary high-water mark of 1846 around that portion of the city.   That line, as traced on the maps, crossed the mouth of Mission Creek and the mouths of all other creeks which in 1851 emptied into the bay of San Francisco.   He, therefore, ordered the Commissioner to direct the surveyor general to secure a correct and authentic copy of the map, designating the line of natural high-water mark, in accordance with the act of 1851, and make it the basis of a survey of so much of the exterior boundary of the claim as it represented, and to modify the Stratton survey in accordance therewith.

Subsequently, after Mr. Schurz had ceased to be the head of the Interior Department and Mr. Teller had become Secretary, application was made to the latter officer to review the decision of the former, and upon such application argument of counsel was heard and a most extended consideration of the whole matter was had.   Secretary Teller observed that all the material questions relating to the boundaries of the tract confirmed were settled, except the single inquiry whether or not, in running the line of ordinary high-water mark of the ocean, and especially of the bay, the main shore or course line of such body of water identified by its larger description should be followed, cutting across the mouths of streams, estuaries and creeks which, intersecting the body of the peninsula, find their entrance into the ocean or bay, or whether such estuaries as fall below high tide should be segregated by following up the tide line on one side and down on the other, so as to make them as it were a part of the sea.   He said that his predecessor had decided that the former was intended by the decree and ex-

pressed its true construction, and, after mature deliberation, he adhered to the same view.

"When we look," said the Secretary, "at the calls for boundary there is no ambiguity, no doubtful phraseology. Said tract being *bounded* on the north and east by the bay of San Francisco; on the west by the Pacific Ocean. The tract *bounds* upon the *bay* and *ocean*, not upon estuaries, creeks and streams intersecting such tract, even though they be navigable and technically termed arms of the sea." The boundary, he added, was not the stream, but the bay; consequently the ordinary high-water mark must be the high-water mark of the shore as pertaining to the sea, and not the high-water mark of the bank as pertaining to a river or stream; so that, although Mission Creek was alleged to have been as well a tidal inflow as an outlet for the inland waters, it nevertheless fell within banks instead of resting upon shores, and must be considered an inland water for all purposes. He added that it was plain that the high-water mark extended to the shore of the bay, leaving out any reference whatever to the inland channels of the streams intersecting the granted peninsula. He accordingly directed a substantial adhesion to the decision of his predecessor, and overruled the application for its review.

After much difficulty with the surveying officers a survey was made pursuant to the directions given, and was approved by the then Commissioner of the General Land Office, and upon that survey a patent was issued to the city of San Francisco, bearing date the 20th day of June, 1884. This patent was forwarded to the mayor of San Francisco, and was accepted on behalf of the city and county.

When Mr. Lamar succeeded Mr. Teller as the head of the Interior Department, application was made to him to recall the patent and issue a new one in accordance with the Stratton survey. In support of the application it was strenuously contended, by the same parties who had resisted the action of his predecessors, that there was a want of jurisdiction on their part to review the decision of the Commissioner of the Land Office. Such contention was urged upon the supposed meaning of the statute, and on the ground that the supervisors of

the city and county of San Francisco had by resolution directed that no appeal should be taken from his decision, and, when it was taken by counsel retained for the protection of the interests of the lot-holders as well as of the city, had declared that his action was unauthorized.

The Secretary, in considering the objections, referred to the fact that the supervisors, subsequently to those resolutions, had requested him, before whom they admitted the case was then pending relating to the boundaries of the military reservation, to take up and decide the case without further delay. And after a careful review of the question of jurisdiction, and the proceedings preliminary to the issue of the patent, he refused to recall the patent, holding that an order by him to that effect would be illegal and void, and that the matter presented for his consideration in the past proceedings of the case did not justify any recommendation to the legal department of the government to institute proceedings to recall, or modify, or in any manner interfere with the patent.

I have stated with as much brevity as possible the steps taken for the confirmation of the title of the city as successor of the Mexican pueblo, which are set forth more in detail in the opinions of the different Secretaries of the Interior laid before us on the hearing, for the statement is important to a clear perception of the character and import of the rulings of the referee and of the court below. An extended narrative of the proceedings would occupy a much greater space and would show that parties claiming an interest in the lands left out of the Stratton survey, and resisting the approval of the official survey subsequently made, had also applied to the Supreme Court of the District of Columbia and to Congress for aid to carry out their pretensions, and were met by the declaration that to obtain a remedy for any errors alleged, resort should have been had to the Secretary of the Interior, as the only revisory authority over the action of the inferior officers of the Land Department. It would also show that in obtaining a recognition of its claim, the city had met from them at every step the most strenuous opposition, and that every possible objection taken to the claim and survey since,

was then presented and fully considered by the different Secretaries of the Interior; so that with truth was it said in the recent decision of this court in *San Francisco* v. *Le Roy*, 138 U. S. 656, 672, that the boundaries of the pueblo were established by the United States after the most thorough and exhaustive examination ever given to the consideration of the boundaries of a claim of a pueblo under the Mexican government.

The parties who carried on the long and protracted contest in the Land Department, against the confirmation of the claim and its survey as finally approved, asserted the acquisition of an interest in those premises under certain deeds of the tideland commissioners, created by the legislature of California.

On March 30, 1868, that legislature passed an act to survey and dispose of certain salt-marsh and tide-lands belonging to the State. It empowered the governor to appoint three persons, who were to constitute a board of tide-land commissioners, and authorized them to take possession of all the marsh and tide lands, and lands lying under water, situate along the bay of San Francisco and in the city and county of San Francisco, belonging to the State; to have the same surveyed and maps of the property prepared; to sell the interest of the State therein, and to execute conveyances to the purchasers. Laws of California, 1867–8, c. 543.

At that time one George W. Ellis had settled upon lands excluded from the Stratton survey, and after its passage he applied to the board of tide-land commissioners and obtained from it two deeds, dated in November, 1875, covering the premises. His grantees carried on the contest, but not in their own names, against the location and survey of the tract confirmed before the Interior Department, and in every possible way sought to defeat its action and secure such a survey as would leave the lands claimed by them without the limits of the pueblo. The interest which the plaintiffs below, the United Land Association and Clinton C. Tripp, had or claimed in the premises covered by the patent to the city of San Francisco was founded upon these conveyances of the tide-land commissioners. Relying upon a title from that source the present action was brought.

As stated above, it is an action of ejectment for the possession of premises within the limits of the pueblo survey and covered by the patent to the city of San Francisco. After issue was joined it was by consent of parties referred to a referee.

The plaintiffs claimed title to the premises in controversy under the deeds mentioned. The defendant relied upon the fact that the premises were within the boundaries of the tract patented. They were situated in what constituted in 1854 the channel of Mission Creek, above its mouth. A witness produced by the plaintiffs testified that he knew their location and had made surveys in their neighborhood in that year, and that they were then below the line of ordinary high-water mark. He did not add "of the bay;" but as the premises were where the water of the creek formerly ran, and where, for aught that appears in evidence, it may now run, it was to the high-water mark of that creek to which he had reference.

The plaintiffs also gave in evidence the final decree of confirmation of the claim of the city of San Francisco rendered by the Circuit Court of the United States, and the Stratton survey, mentioned above, with the certificate of approval of the surveyor general and the confirmation thereof by the Commissioner of the General Land Office. Objection was made to the introduction of this survey on the ground that it was not competent evidence, not being matter of record; and that it had been cancelled and superseded by another survey made in accordance with instructions of the Secretary of the Interior. The referee overruled the objections under the exception of the defendant, admitted the rejected survey, and, among other things, held that in approving that survey the commissioner was acting in a judicial capacity, and that his judgment thereon was not reversible and was not legally reversed.

The defendant, to show that no title ever vested in the plaintiffs under their alleged deeds from the tide-land commissioners, gave in evidence the patent of the United States issued to the city of San Francisco, dated the 20th of June, 1884; also the plat of the pueblo lands finally confirmed to the city

under instructions of the United States surveyor general, ordered by the Secretary of the Interior, and approved by the Commissioner of the General Land Office, upon which the patent issued.

It was conceded that the patent included within its boundaries the premises in question. The referee admitted the evidence thus offered of the patent and survey, with the concession that they included the demanded premises, but refused to find for the defendant thereon, and the defendant excepted.

The decree of confirmation, as seen above, bounds the tract confirmed on the north and east side by ordinary high-water mark of the bay of San Francisco. The Stratton survey and the proofs before the referee did not show that the premises in controversy were below that water mark of the bay, but only that they were below that water mark at a point in the channel of Mission Creek, and yet the referee held that the Stratton survey and the parol proofs in the case showed that the premises were outside of the specific boundary of the decree, and therefore remained the property of the State. He accordingly gave judgment for the plaintiffs.

His rulings on the trial exhibited several errors. He gave no effect to the general rule that in actions of ejectment a patent of the United States, issued upon a confirmation of a land claim to which protection had been guaranteed by treaty, cannot be collaterally assailed for mere error alleged in the action of the officers of the government. He admitted in evidence, against the objections of the defendant, the rejected survey of Stratton, in contravention of the principle that a rejected survey of officers of the Land Department is in law no survey, and inoperative for any purpose. It has so been held in numerous instances and never to the contrary. In the particulars in which the Stratton survey was modified by direction of Secretaries Schurz and Teller, it was of no more efficacy as a legal document than so much waste paper. He apparently perceived that there was something bizarre in receiving as evidence a rejected survey, or a modified survey, except in the particulars in which the modification was had, and sought to avoid this position by holding that the action

of the Commissioner in approving the survey was beyond the reach of the Interior Department, and that it, was not, therefore, legally reversed; thus brushing aside the important functions of that Department over the surveys of private land claims, which it has exercised since its organization, and which has been always recognized by the courts of the United States. *Cragin v. Powell*, 128 U. S. 691, 697. In answer to his erroneous conclusions in this respect, nothing can be added to the force of the statement in the opinion of the majority.

There were several hundred claims to lands in California, under Mexican grants, presented for confirmation to the board of land commissioners created by the act of 1851. They embraced many millions of acres of land, and in a large number, probably the majority of cases, where the claim was confirmed, the survey thereof by the surveyor general for the State, after being considered and approved or rejected by the Commissioner of the General Land Office, passed under the supervision of and were in some respects modified by the Secretary of the Interior as the head of the Land Department of the United States. If the position taken by the referee, that the action on the survey of such claims by the Commissioner was final, could be sustained, every patent issued upon a survey of a claim which had been in any respect modified or changed by direction of the Secretary of the Interior would be open to attack, to the frightful unsettlement of titles in the State and to the infinite disturbance of the peace of its people.

When the patent to the city was brought before the referee, and it was conceded that the land in controversy was included within the boundaries embraced by the survey embodied in it, judgment should have been rendered for the defendant. The title under the patent necessarily antedated any possible claim of the State of California to the lands within the limits of the pueblo. It went back to the acquisition of the country from Mexico. When the United States acquired California the inhabitants were entitled by the law of nations to protection from the new government in all rights of property then possessed by them. Jurisdiction and sovereignty passed from one nation to the other by the cession, but not private rights of

property; their ownership remained as under the former government. And by the term property, as applied to land, all titles are included, legal or equitable, perfect or imperfect. "It comprehends," as said by this court in *Soulard* v. *The United States*, 4 Pet. 511, 512, "every species of title, inchoate or complete. It is supposed to embrace those rights which are executory, as well as those which are executed. In this respect the relation of the inhabitants to their government is not changed. The new government takes the place of that which has passed away."

By the treaty of Guadalupe Hidalgo, the United States also stipulated for such protection, and that implied that rights of property, perfect or imperfect, held by the inhabitants previous to the acquisition of the country, should be secured to them, so far as such property was recognized by the laws and constitution of the new government; and for that purpose that the holders should receive from the new authorities such official and documentary evidence of their rights as would assure their full possession and enjoyment. Pueblos in that respect stood in the same position as private individuals. All their rights of property, legal or equitable, were alike entitled to protection. Whatever property was ceded to the United States from Mexico, whether marsh lands or tide lands, passed subject to the obligation to protect existing claims to them of all parties. The State could take no greater interest than the United States acquired; all lands she received went under her control charged with the equitable claims of others, which the United States were bound by the treaty and the law of nations to protect. The marsh lands granted to her by the act of Congress of September 28, 1850, were thus affected. And the same was true of the tide lands. Whatever lands of that nature passed to the United States were held for the future State, subject, however, to any trust from the former government which might require their disposition in some other way. The duty and power of the United States in the execution of their treaty obligations to protect the property claims of all persons, natural or artificial, were superior to any subsequently acquired interest of the State or of individuals. Mexico owned the tide

lands as well as the uplahds, and it was, of course, in her power to make such disposition of them in the establishment and organization of her pueblos as she may have judged expedient. And whether she did make such disposition by her laws was a matter exclusively for the United States to ascertain and determine. As said by the Supreme Court of California in *Ward* v. *Mulford*, 32 California, 372 : " In private proprietorship and in sovereign right the United States succeeded the Mexican government, and in both these respects California, so far as she acquired any right in either, succeeded the United States and became privy to the latter in estate in respect to all lands within her borders, whether such as may be held in private or in sovereign right. In this respect no distinction can be made between the lands acquired by her through Federal grants, and such as she took by virtue of her sovereignty."

The obligation of protection imposed upon the United States by the law of nations, and assumed by the treaty, was political in its character, to be performed in such a manner and on such terms as the United States might direct. As held by this court in *Beard* v. *Federy*, 3 Wall. 478, 492, they declared by the act of March 3, 1851, to settle private land claims in California, the manner and the terms upon which they would discharge this obligation. They there established a special tribunal, or board of commissioners, before which all claims to land in that State derived from Spanish or Mexican authority were to be investigated; they required evidence to be presented respecting the claims; appointed law officers to appear and contest them on behalf of the government; authorized appeals from the decisions rendered by the commissioners to the District Court, and from the decisions of that court to the Supreme Court of the United States, and declared that in the determination of the claims presented, the commissioners and those tribunals should " be governed by the treaty of Guadalupe Hidalgo, the law of nations, the laws, usages and customs of the government from which the claim is derived, the principles of equity and the decisions of the Supreme Court of the United States, so far as they were applicable." 9 Stat. c. 41, § 11, p. 633. It also made provision for the investigation and deter-

mination of the property rights of pueblos; and designated the officers who should in all cases survey and measure off the land when the validity of the claim presented was finally determined. When it appeared by the action of their officers and tribunals that the claim asserted was valid and entitled to recognition, and that its boundaries were ascertained, the government was to issue its patent to the claimant.

And what was the effect and operation of this instrument? It was not merely a quit-claim or conveyance of whatever interests the United States held in the lands embraced; it was something more; it was, as declared in the case cited, record evidence upon the title of the claimant from the former government. As there said: "By it the government declares that the claim asserted was valid under the laws of Mexico; that it was entitled to recognition and protection by the stipulations of the treaty, and might have been located under the former government, *and is correctly located now so as to embrace the premises as they are surveyed and described. As against the government, so long as it remains unvacated, it is conclusive. And it is equally conclusive against parties claiming under the government by title subsequent.*" The patent being thus conclusive, can only be resisted by those who hold paramount title to the premises from Mexico antedating the title confirmed, that is, by persons who can successfully resist any action of the United States in disposing of the property or in perfecting the title of the claimant.

In the case from which I have cited the court added, in order to impress the importance of this doctrine for the stability of titles in the State resting upon confirmed and patented Mexican grants: "It is in this effect of the patent as a record of the government that its security and protection chiefly lie. If parties asserting interest in lands acquired since the acquisition of the country could deny and controvert this record, and compel the patentee in every suit for his land to establish the validity of his claim, his right to its confirmation and the correctness of the action of the tribunals and officers of the United States in the location of the same, the patent would fail to be, as it was intended it should be, an instrument of quiet and

security to its possessors. The patentee would find his title recognized in one suit and rejected in another, and, if his title were maintained, he would find his land located in as many different places as the varying prejudices, interests or notions of justice of witnesses and jurymen might suggest."

The doctrine of that case has never been departed from, but, on the contrary, has always been followed and approved. Numerous decisions of the Supreme Court of California, commencing with the 13th volume of its reports and extending down to a late period, express the same doctrine with equal clearness and emphasis. *Moore* v. *Wilkinson,* 13 California, 478, 484; *Yount* v. *Howell,* 14 California, 465; *Teschemacher* v. *Thompson,* 18 California, 11; *Leese* v. *Clark,* 18 California, 535; *Ward* v. *Mulford,* 32 California, 365; *Chipley* v. *Farris,* 45 California, 527; *People* v. *San Francisco,* 75 California, 388.

But notwithstanding the superior and conclusive character of the title presented by the patent, and the emphatic decision of the highest tribunal of the country, and repeated decisions of the State Supreme Courts to the same effect, that until vacated that instrument was conclusive against the government and parties claiming by title subsequent, the referee found otherwise and held that the plaintiffs, who derived whatever interest they possessed twenty-nine years subsequently to that of the city, held the better right and were entitled to judgment for the demanded premises; and such judgment was entered in one of the Superior Courts of the city. From that judgment an appeal was taken to the Supreme Court of the State, where it was affirmed. A rehearing being granted, a reargument was had, and a second time the judgment was affirmed by four judges of the court, the remaining three dissenting. From the latter judgment the case is brought to this court on a writ of error.

From the opinions upon both affirmances it appears that the court below, equally with the referee, lost sight of the principle that in actions at law a patent of the United States, upon a confirmation of a private land claim asserted by virtue of rights acquired under a foreign government, is not open to

collateral attack, but must be taken as correct until vacated, not only as to the validity of the claim confirmed, but as to the boundaries established. It is hardly necessary to say that any attempt to overthrow these conclusions in either particular, where the tribunal affirming the validity of the claim and the department establishing the boundaries had jurisdiction, is collaterally attacking the patent.

That the land commissioners and the Circuit Court of the United States had jurisdiction to hear and determine the validity of the claims asserted by the city of San Francisco is not open to question. The laws of the United States gave them such jurisdiction, and when that claim was confirmed the law directed by what officers its boundaries should be established and surveyed. It was the exclusive province of those officers to ascertain where the line of true boundary ran, subject to the control and supervision of the Interior Department. To say that those who directed and supervised the survey had not jurisdiction to perform that duty, is to deny efficacy to the laws of Congress.

The court below upon the first affirmance rejected the boundary as established and surveyed by the officers appointed by law for that purpose, and assumed that the line of ordinary high-water mark of Mission Creek running into the bay, was, as far as such line extended, the true boundary designated by the decree, and held that land below such line was the property of the State. In other words, it assumed that the boundary of the pueblo was to follow the line of high-water mark of the creek, and not be confined to the high-water mark of the bay. It thereupon stated that the question involved was whether the officers of the Land Department had power to patent land outside of the natural boundaries given in the decree of confirmation.

In this statement the learned court fell into an error. No such question was involved in the case. The approved survey upon which the patent was issued crossed the mouth of Mission Creek and included the lands above its mouth, among them the premises in controversy. The question involved, therefore, was whether in an action of ejectment for the pos-

session of those lands the plaintiffs could collaterally assail the correctness of the official survey upon which the patent was issued and establish another line as the true boundary, and then recover the lands on showing that they were outside of the new boundary thus established. I do not think that such a position was ever successfully asserted in any court. If there was error in the survey embodied in the patent it could not have been shown in this action. It could only have been corrected by direct proceedings for that purpose instituted by the government or by its authority. This is elementary law, and in vain will authorities be sought to contradict this view.

Proceeding on the assumption that a different line from the one officially established constituted the true boundary line of the tract confirmed, the court below declared that it was the duty of the surveyor to follow such different line — though otherwise directed by the highest officer of the Land Department, who had the sole right of control in the matter — and, that as the surveyor did not follow that different line, he included, according to its judgment, lands within his description not within the decree of confirmation.

I may speak of the decree with some confidence as a member of the court by which it was rendered, and a distinct recollection remains with me of the circumstances under which the language used was adopted. The original decree of confirmation was rendered in October, 1864, and stated the land confirmed to be "a tract situated within the county of San Francisco, and embracing so much of the upper portion of the peninsula on which the city of San Francisco is situated, as will contain an area of four square leagues," as described in the petition. A motion for a rehearing was made, which kept the case open until the following spring, the judge who pronounced the decree being absent from California in Washington in attendance upon the Supreme Court. On his return the question of a rehearing was brought up, when it was suggested by counsel that the decree needed correction, so as not to include in the claim confirmed the beach and water lots conveyed to the city by the act of the legislature of 1851. Reference was made to the map prepared under the directions

of that act, on which a line was drawn in red ink, marking the separation of lands above the ordinary high-water mark of the bay and lands below it, and it was suggested that the insertion in the decree of the words "above ordinary high-water mark, as the same existed at the date of the conquest of the country, namely, the seventh of July, 1846," would establish the line as indicated on the map, and that thus in the decree of confirmation lands granted to the city by the State would not be affected. Upon that suggestion, made by Mr. Gregory Yale, a lawyer of distinction at the bar, whose clients had become alarmed at the language of the original decree, the change was made.

In addition to this fact it may be observed that at the time the Circuit Court was not ignorant of the universal rule governing the measurement of waters, to which the Supreme Court of the State makes no reference in its decision, and of which it seems to have been entirely oblivious, that where a water of a larger dimension is intersected by a water of a smaller dimension, the line of measurement of the first crosses the latter at the points of junction, from headland to headland. The existence of tide lands in the intersecting water in no respect affects the result. For illustration, in the measurement of a body of water like Long Island Sound, when the Connecticut River is met the line of survey does not follow up that river to Hartford because the tide is felt at that place, but it crosses the mouth of the river from headland to headland. So, too, the measurement of Chesapeake Bay does not include the Potomac River up to Washington because the tide is felt at the site of the capital. It would be absurd to include in the measurement of the bay of San Francisco the waters of the river Sacramento as far as the city of that name, nearly a hundred miles above the bay, because the tide is felt there ; or to embrace the river San Joaquin as far as Stockton because the tide reaches to that place. This is so plain that it excites surprise that any question should have been made upon the subject. And if a river extending a hundred miles or more could not be included in the bay, even though affected by the tides, neither can a stream of less dimensions, though not ex-

ceeding over one or two miles. Not only has this rule in the measurements of waters prevailed on the continent of Europe from the time of the Roman Empire, but it has been always accepted as controlling in England and in the United States, and never been, that I am aware, questioned except in the present case.

When the survey here was pending before one of the Secretaries of the Interior, application was made to the head of the Coast Survey of the United States for the rule adopted by that bureau in the measurement of waters, and the answer was the statement of the rule which I have given; and it is a singular fact that, as an illustration of its application, reference was had to the bay of San Francisco and Mission Creek, and the declaration made that in the measurement of the bay the line of the survey would cross the mouth of that creek. Admiral Rodgers, who was at one time the head of the Coast Survey in California, and had surveyed the line of ordinary high-water mark of the bay of San Francisco, filed his affidavit to the effect that he had since 1851 been stationed in California in charge of the United States survey of the coast thereof, including the peninsula of San Francisco; that the traced chart or map showing the line of ordinary high water along the eastern side of the peninsula of San Francisco from Rincon Point to and including Islais Creek, as surveyed by the Coast Survey of the United States in 1852, was prepared from the published surveys of the Coast Survey of the United States, and that the line laid down on that map in blue pencil, from Rincon Point, around Mission Bay, to and including Islais Creek, and crossing Mission and Islais Creeks, was a true delineation of the line of ordinary high-water mark as it existed when he first knew it in the year 1852. He added that " in determining a boundary line stated as the line of 'ordinary high-water mark,' on the bay of San Francisco, there can be no other course than to follow the stated line of ordinary high tide on the shore of the bay, crossing the mouths of all inferior tidal streams or estuaries, many of which enter into San Francisco Bay at different points, and not to follow the meanders of any such inferior tidal streams or estuaries."

The assumption, therefore, of the court below, that the decree of confirmation called for any other line than the one actually surveyed and embodied in the patent was an error. It was founded upon a misapprehension of the law governing the surveys of waters of that kind, or from overlooking its existence. The statement in the opinion of the court as to the requirement that the surveyor general in making the survey of a confirmed claim should follow the boundaries of the decree as near as practicable, whenever the decree specifically designates them, is undoubtedly correct, and it was the duty in this case of the surveying officers of the Land Department, under the supervision of the Secretary of the Interior, to ascertain what those boundaries were, and to follow the decree in making the survey. That they accomplished this is conclusively established, so far as the present action is concerned, by the official survey itself returned by them, and subsequently approved by the Commissioner of the Land Office.

The question as to what was the boundary line of the tract confirmed also became the subject of judicial inquiry in the Circuit Court of the United States in 1878. An action was brought by one Tripp, who is one of the plaintiffs in this case, for a parcel of land constituting a portion of a block in the city of San Francisco. The premises were situated where Mission Creek formerly ran, and distant about a mile from its mouth. All that part of the stream covered by the block in which the premises were situated had been filled in and buildings erected thereon, which were occupied as private residences. The plaintiff claimed title under the same conveyances of the board of tide-land commissioners upon which the plaintiffs below rely in this case, and the same contention was made there as here  The question presented was whether the title to those premises passed by the tide-land commissioners' deeds or whether they were within the limits of the pueblo claim as confirmed, although not at that time patented. The court said: "Whether the waters of the bay were ever carried by the tide over the lands is a matter upon which the evidence is conflicting. The creek was often swollen by water from the adjacent hills so as to overflow its banks, and the tide some-

times, though not regularly, forced back the waters of the creek so as to cause a similar overflow. But, from the view we take of the case, it is immaterial whether the lands could ever properly be termed tide lands or marsh lands, whether they were at any period covered by the daily tides, or lay beyond their reach at their highest flood. The record of the proceedings and the final decree in the Pueblo Case have been given in evidence, and from them it appears that the premises are situated within the limits of the tract confirmed to the city of San Francisco." The court added: "Mission Creek never constituted any portion of the bay of San Francisco any more than the Sacramento River constitutes a portion of the bay of Suisun, or the Hudson River a portion of the bay of New York. As the demanded premises lie where Mission Creek formerly existed, or where its banks were, they necessarily fall within the tract confirmed to the city. The boundary of that tract runs along the bay on the line of ordinary high-water mark, as that existed in 1846, crossing the mouth of all creeks running into the bay, and that of Mission Creek among others. The boundary would have been a very singular one had it followed the windings of that creek and its branches wherever the tide waters of the bay may have flowed. The laws of Mexico relating to lands to be assigned to pueblos required that such lands should be laid out in a square or prolonged form, according to the nature of the country, and, so far as practicable, have regular lines for boundaries. The decree of the United States Circuit Court in confirming the claim of the city followed this requirement, and gave the boundaries which could be easily ascertained, and which formed as compact a body as the situation of the country would permit." *Tripp* v. *Spring*, 5 Sawyer, 209, 212.

As thus appears, the identical question involved in this case was decided in that. No case was ever tried with more care, or greater consideration, and at the conclusion of a trial of several days the court decided that judgment must be entered for the defendant. The presiding justice stated the grounds of the decision orally, and observed that as the questions involved were deemed of great importance he would at a subse-

quent day file an opinion embodying their substance. It is a common practice with judges of the highest courts to give opinions orally and write them out subsequently, after the decision is rendered, and that fact in no way affects their authoritative character. The pressure of business before the court may often prevent any other course being pursued.

Counsel for the plaintiff then stated that special findings in the case were desired, in order that should the case reach the Supreme Court it might be finally determined there. Upon that suggestion the entry of judgment was stayed, and an adjournment of the court had, that such findings might be prepared. On the next day the case was dismissed by stipulation of parties.

The opinion of the court, pronounced at the close of the trial, and subsequently written out was, notwithstanding the dismissal, as much authority on the questions of law presented as though a formal judgment had been entered, although the judgment ordered, because not entered on account of the dismissal, could not be pleaded in bar of a future action.

The court below having assumed that another line than the one officially established was the true one, took the extraordinary ground that the error committed in that respect by the surveying officers, though acting under the express directions of the Land Department, was jurisdictional and fatal to their action, rendering it void, and opening the patent embodying the survey to collateral attack. And it proceeded to cite several decisions in supposed support of this view, but which only were to the effect that where the Land Department had no jurisdiction over the subject matter considered, its patent could be assailed collaterally.

In thus holding, the court failed to distinguish between what was, upon its own statement, mere error in the action of the Land Department, and matters which were entirely beyond its jurisdiction. The ascertainment of the true line of the boundaries of the claim confirmed was a matter especially entrusted to that department by the laws of Congress, as already stated. If the officers of that department in executing the survey made mistakes, ran erroneous lines and included

lands which they should have excluded, those facts did not justify the assertion that they acted without jurisdiction in making the survey, and that, therefore, their whole proceedings were void. If all that is asserted be true they only erred in the exercise of their jurisdiction, and the remedy for their errors before the issue of the patent lay in an appeal to higher officers of the department — from the surveyor general to the commissioner, and from his decision to the Secretary of the Interior; — and if after the issue of the patent like objections were urged, the remedy could be sought only by direct proceedings.

The distinction between errors committed where jurisdiction exists to take the proceeding in which the alleged error arises, and where there is an entire want of jurisdiction over the subject matter considered, is too familiar to be discussed. The distinction is constantly applied with reference to the proceedings of ordinary tribunals. If they have jurisdiction of the subject matter and the parties, their judgment cannot be collaterally assailed for mere errors committed in the proceedings leading to it. The remedy for errors must be sought by application for a new trial or by appeal for a review to an appellate court. The same distinction prevails with reference to the proceedings of the special tribunal or department of the government to which is entrusted the supervision of measures for the issue of its patent.

The cases referred to and dwelt upon as supposed to support the opposite doctrine are not susceptible of the meaning attributed to them. The principal cases cited are *Smelting Co.* v. *Kemp*, 104 U. S. 636, 641; *Wright* v. *Roseberry*, 121 U. S. 488, and *Doolan* v. *Carr*, 125 U. S. 618. They assert no new doctrine, but law, which has always existed and been recognized, though seldom more misapplied than here. That the United States cannot convey by patent what it never owned, or has already parted with, no matter with what formality the instrument is issued, is a self-evident proposition. The government in that respect is under the same limitations as an individual. That is the only purport, so far as the point raised here is concerned, of the decision in *Wright* v. *Roseberry*,

where a patent of the United States for land claimed under the preëmption laws was defeated by showing that the premises in controversy were swamp and overflowed land previously conveyed to the State by the swamp land act of September 28, 1850. 9 Stat. 519. Nor could the United States authorize a patent for land to the pueblo, or to its successor, the city, if the former government of Mexico had conveyed the property to others. There are such cases within the limits of the pueblo, and the claims have been confirmed and patented under the Land Department to the grantees or their representatives. Whenever in the Pueblo Case it could be shown that grants had been made by Mexico of portions of the land claimed by the pueblo to other parties, such grants were excepted from the confirmation to the city. Nor can a patent of the United States be issued by officers of the Land Department for lands reserved from settlement and sale; and the want of authority in the officers can be shown at law to defeat a patent of that character. It is in such case an attempted conveyance of land not open to sale; as would be a patent for land within the Yellowstone or Yosemite Park. It was of land within the limits of a valid Mexican claim excluded from grant to the Central Pacific Railroad Company that the decision in *Doolan* v. *Carr* had reference. It was there held that the patent to the railroad company could be defeated by showing that the lands conveyed were thus excluded. There was nothing new in the doctrine that it could be shown in an action at law that the property patented was not subject to grant. Nor can it be questioned that if parties, not authorized by law to supervise the proceedings to a patent, should assume that function, that the objection might be taken when the patent was offered in evidence. As, for instance, if the supervisors of San Francisco should undertake to exercise the functions of the Land Department, any one prosecuted under their patent could assail it by showing that the power to execute such an instrument was vested in a different body. So, too, if the estate which the Land Department was authorized to convey was different from that transferred by the patent — as, for instance, a lease-hold interest, instead of the fee — that fact could be shown and the patent limited in its operation.

In *Smelting Co.* v. *Kemp*, the court treated at large of the conclusive presumptions attending a patent of the United States for lands, but added, that in thus speaking of them it assumed "that the patent was issued in a case where the Department had jurisdiction to act and execute it; that is to say, in a case where the lands belonged to the United States and provision had been made by law for their sale. If they never were public property, or had previously been disposed of, or if Congress had made no provision for their sale, or had reserved them, the Department would have no jurisdiction to transfer them, and its attempted conveyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed. The action of the Department would, in that event, be like that of any other special tribunal not having jurisdiction of a case which it had assumed to decide. Matters of this kind, disclosing a want of jurisdiction, may be considered by a court of law. In such cases the objection to the patent reaches beyond the action of the special tribunal, and goes to the existence of a subject upon which it was competent to act."

The attempt is futile to use these cases, or any other case, to establish the proposition that if an error can be shown in the action of an officer of the Land Department in a matter subject to its jurisdiction the proceeding of the officer may be treated as a nullity and the patent issued thereon be collaterally assailed. This view is untenable, and does not merit serious consideration. If it could be sustained it would be subversive of all security in the judgments of ordinary tribunals, as well as in those of special tribunals like the Land Department. Nor is there any pertinency in the observations as to the reservation from grant of the seashore under the law of the former government. No claim was ever made in the Pueblo Case for any part of the seashore. Those terms apply in this country only to land covered and uncovered by the daily tides. They cannot possibly have any application to the banks of creeks or to land under their waters. The rule of the civil law of Europe that lands covered and uncovered by the tides at their highest flood during the year constitute the shore of the sea has never

been applied to that portion of this country ceded to the United States by Mexico. The claim of the pueblo was for land above the ordinary high-water mark of the bay, not for any land covered and uncovered by the tides, either daily or when they reach their highest point during the year. As said in *San Francisco* v. *Le Roy,* 138 U. S. 656, 671, " The lands which passed to the State upon her admission to the Union were not those which were affected occasionally by the tide, but only those over which tide water flowed so continuously as to prevent their use and occupation. To render lands tide lands, which the State, by virtue of her sovereignty, could claim, there must have been such continuity of the flow of tide water over them, or such regularity of the flow within every twenty-four hours as to render them unfit for cultivation, the growth of grasses or other uses to which upland is applied."

The reasons given by the court below on the second affirm-ance of the judgment of the referee are marked by the objections stated to its former opinion. The true doctrine as to the effect of patents in actions at law is stated in a decision of the court below in *De Guyer* v. *Banning* — rendered whilst this case has been pending here, in which that court, following a long line of previous adjudications, unbroken except by this case, declares that upon a confirmation of a Mexican grant the patent issued by the United States to the claimant is the only evidence of the extent of the grant, and that if there is a conflict as to its location and extent between it and the decree of confirmation, the patent must control. It is the only doctrine which will insure peace and tranquillity to parties holding under patents issued upon confirmed Mexican grants. Any other doctrine would introduce endless confusion and perplexity as to all such titles. If there be, in fact, any material conflict between the boundaries given in the decree of confirmation and those described in the official survey, the only remedy is to be sought by direct proceedings instituted by the government, or by its authority. Until the alleged conflict is thus determined and adjusted, the patent must control.

From the views expressed I am clearly of opinion that the Supreme Court of the State erred in affirming the judgment

of the Superior Court entered upon the report of the referee; it should have reversed that judgment and ordered judgment for the defendant.   This conclusion is, I think, established beyond all controversy in the opinion of the court.   But it is unnecessary to pursue this case further.   I have treated it at much length because the title of the city has been a subject of consideration in one form or another for now over thirty-nine years, and the questions presented have been discussed by counsel with marked ability and learning.   The claim was originally presented to the board of commissioners in 1852, and it was decided by that board in 1854.   It was then appealed to the District Court of the United States, and there remained unacted upon for over eight years.   An act of Congress then authorized it to be transferred to the Circuit Court of the United States, to which court it subsequently passed in September, 1864.   In October following a decree of confirmation was entered, which was modified May 18, 1865, and then entered in its final form.   An appeal from that decree was taken to the Supreme Court of the United States, and was dismissed by that court in December, 1866, on motion of the attorney general upon stipulation of parties.   A survey was made of the confirmed claim in 1868, and that survey, being appealed from, remained unacted upon before the Commissioner of the General Land Office for over nine years.   After it was acted upon by him an appeal was taken from his decision to the Secretary of the Interior, and it was before one secretary after another for five years, so that the patent was not issued until 1884.

Even then the opposition to the just claim of the city and of parties holding under the city did not cease, but has been continued in one form or other ever since.   It is to be hoped that all annoyances and litigation from such opposition will now be ended.

THE CHIEF JUSTICE, MR. JUSTICE BRADLEY and MR. JUSTICE GRAY did not hear the argument or participate in the decision of this case.